THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENTS, *v.* LOUIS WILLETT, APPELLANT.

*Jurors in a criminal action — when not disqualified by reason of having formed an opinion — Code of Criminal Procedure, sec. 376 — right to review on appeal challenges to jurors — Code of Criminal Procedure, sec. 455, subd. 2, 1873, chap. 427 — the burden of proof rests upon the people — a reasonable doubt as to any element of the crime entitles the prisoner to an acquittal.*

Under section 376 of the Code of Criminal Procedure, the previous expression or formation of an opinion or impression as to the guilt or innocence of the accused does not disqualify a person from acting as a juror, provided that he declares on oath that he *believes* that such opinion or impression will not influence his verdict, and that he *believes* that he can render an impartial verdict, according to the evidence; it is not necessary that he should declare that he knows that it would not prevent him from so doing, nor need he deny that there was some possible chance that it might.

The statute does not appear to contemplate a review by the General Term of the

decision of the court accepting such a juror, when the statutory conditions are found to exist which authorize the court to make it.

*Quære*, as to whether subdivision 2 of section 455 of the Code of Criminal Procedure, modifies chapter 427 of 1873, so that exceptions to challenges for cause can only be heard with respect to the jurors "who participate in the verdict," and not as to those who were accepted, and then dismissed on the peremptory challenge of the accused.

The defendant was tried and convicted of the offense of murder in the first degree, for killing one Kelland, by striking him many blows over the head with a long, heavy brass faucet. Some of the counts in the indictment charged that the defendant committed the crime while engaged in the commission, or in the attempt to commit, a larceny, while others charged that he struck the blows with a deliberate and premeditated design to effect the death of Kelland. The nature of the weapon used, the number of the blows and the attendant circumstances were such as to justify the jury in inferring that the killing was done with a deliberate and premeditated design, or while engaged in the commission of a larceny. The defendant testified in his own behalf that he had been insulted and struck by the deceased, and had left the room; that in the hall he saw the faucet, seized it, returned to the room, and, in the heat of passion, struck the deceased; that having no money he took some belonging to the deceased, together with some of his clothes, and ran away, not knowing that he had killed him.

The court charged in substance that as, from the facts and circumstances which were proved to have attended the killing, the jury might find that it was done with a deliberate and premeditated design to effect the death of Kelland, it was necessary for the prisoner to satisfy them, by a preponderance of the evidence, that his statement of the crime was the correct one, and refused to charge that the prisoner was entitled to the benefit of the doubt as to every proposition upon which the jury had to pass, as a matter of fact, which distinguished his offense from intentional premeditated killing, and reduced it to a lesser degree of crime.

*Held*, that the court erred in so charging.

That as the testimony of the defendant was calculated to weaken the evidence produced by the people to show that, at the time of the killing, he intended to commit a larceny, or that he killed the deceased with deliberation and premeditation, he was entitled to an acquittal if his testimony was sufficient, when taken in connection with that of the people, to create in the minds of the jury a reasonable doubt as to these facts.

APPEAL from a judgment of a Court of Oyer and Terminer, held in Ulster county, in December, 1884, convicting the defendant of murder in the first degree.

*William Lounsbery*, for the appellant.

*A. T. Clearwater*, district attorney, for the People.

LANDON, J. :

In procuring the jury thirty of the persons called and examined as to their qualifications as jurors were challenged by the prisoner's counsel for cause, and the challenge overruled by the court, and thereupon the prisoner's counsel challenged them peremptorily, thus exhausting his peremptory challenges. Meantime, eleven jurors had been selected and sworn, who were acceptable to the people and the prisoner. Then Abram J. Bell was called and examined, and was challenged by the prisoner's counsel for cause, and the challenge overruled by the court, and he was accepted by the court and sworn and served as the twelfth juror, the prisoner, however, proffering a peremptory challenge as to him, which was not permitted. The prisoner's counsel now selects the case of Robert J. Merritt, who was one of the jurors as to whom the challenge for cause was overruled, and who was challenged peremptorily by the prisoner, as presenting more clearly than any other case the grounds upon which error is assigned in overruling the prisoner's challenge for cause. Mr. Merritt testified upon his examination substantially, that from reading the newspaper accounts and hearing people talk about the case, he had formed and expressed an opinion or impression to a certain extent as to the guilt or innocence of the prisoner, and still retained it. He had not read any statement or report of a judicial examination of the case by the coroner or otherwise. He spoke of his opinion as nothing more than obtained from reading the papers. Assuming from his testimony that it was true that he had formed, expressed and still retained an impression in reference to the guilt or innocence of the prisoner, derived from sources other than an examination of the evidence, the question is, whether he did substantially " declare on oath (1) that he believes that such opinion or impression will not influence his verdict, and (2) that he can render an impartial verdict according to the evidence." (Code Crim. Pro., § 376.) It was necessary, as stated in *The People* v. *Casey* (96 N. Y., 122), for the juror to make those two declarations on oath in substance.

He was asked : Q. Do you believe that, notwithstanding any previous expression or formation of an opinion, or impression in reference to the guilt or innocence of this defendant by you, or any present opinion or impression in reference thereto, which you may

now have, that such opinion or impression will not influence your verdict? A. I don't think it would. I would try to give a verdict according to the evidence. Q. You believe you could render an impartial verdict according to the evidence, notwithstanding any impression you now have or have had? A. I think I could.

It is plain that these two questions were framed with reference to the statutory requirements. They embraced the whole ground, and the answers of the witness were responsive and substantially full. The cross-examination that followed related to the bias upon his mind, not to his belief in his power to rise above it. He said there was an opinion on his mind that it would be hard for him to forget, and he was asked: "Q. Would it influence your mind in the way of a bias? A. I don't know that it would. Q. Do you know that it would not? A. I should not like to say; I don't think it would." The statute does not require him to say that he knows he would not be influenced by his previous or present opinion or impression, but simply that he *believes* he would not be, and that he *believes* he can render an impartial verdict. He repeated in various ways that he believed he could give a verdict according to the evidence, and that the opinion he had or had had would not influence his verdict. He would not swear that he knew it would not, nor did he deny that there was possibly some chance that it would.

We have no hesitation in saying that this juror, fairly and substantially, perhaps not literally, met the conditions which authorized the court then to decide whether to accept him or not. It was then for the court to declare, by its acceptance or rejection of the juror, whether it was "satisfied that he does not entertain such a present opinion or impression as would influence his verdict." (Code Crim. Pro., § 376.) The court had measured the juror, his candor, his capacity, his real meaning; how far he had been helped or crippled in expressing the real state of his mind by the many questions propounded to him. It does not appear to be contemplated by the statute that we should review that decision if we find that the statutory conditions existed authorizing the trial court to make it.

The learned district attorney urges that, under the Code of Criminal Procedure, exceptions upon challenges for cause can only be heard with respect to the jurors "who participated in the ver-

dict." (Sec. 455, subd. 2.) That, in this respect, chapter 427, Laws of 1873, which allowed " *all* challenges of jurors " to be reviewed, is no longer the law; that the change has been made in view of the fact that the prisoner is accorded thirty opportunities to differ from the court with respect to the fitness of a juror; that this is a reasonable limit as to jurors who do not sit, and makes it proper to confine the review of exceptions to rulings upon challenges to those jurors who do participate in the verdict. We are greatly impressed with the force of this argument, but as we conclude to overrule the exceptions taken upon other grounds, we do not feel it necessary to pass upon it.

Edwin Kelland and Walter Kelland, his brother, kept a saloon in Kingston. The saloon occupied the lower floor of the building. Their sleeping-room was upon the floor immediately above the saloon. The prisoner was a young man between seventeen and eighteen years of age, and had been in their service in and about the saloon for about six weeks before the homicide. His sleeping-room was on the same floor as the deceased's. The saloon on the night of the 7th of January, 1884, remained open until after midnight. The prisoner retired to his sleeping-room about one o'clock of the morning of the eighth, and Edwin Kelland to his room a few minutes later, taking with him in a segar box upwards of seventy-five dollars in money. No other persons then remained in the building.

The evidence on the part of the people tended to show that shortly after Edwin Kelland retired to his sleeping-room, the prisoner entered it armed with a long, heavy brass faucet — a deadly weapon if used as a club — and struck Kelland over his head many severe blows. The prisoner admitted striking the blows with the faucet. These blows crushed his skull, reduced him to unconsciousness, and caused his death three days later. The prisoner stole the money from the segar box, took the watch and the best clothes of the deceased and fled. He remained at large for several months. The theory of the prosecution was that the prisoner entered the sleeping-room with the intent to steal and killed the deceased while engaged in the commission of or in the attempt to commit the larceny. Several counts of the indictment are framed to meet this aspect of the case. Other counts charge that the

prisoner, by striking Edwin Kelland heavy blows upon the head with a deadly weapon — the faucet in question — from a deliberate and premeditated design to effect his death, did kill and murder him. Without reproducing the testimony it is proper to state that, as adduced by the prosecution, it tended strongly to show that larceny was the primary intent of the prisoner, and that the homicide was committed by him while engaged in it.

After the prosecution had rested the prisoner testified in his own behalf that Edwin Kelland, upon entering his sleeping-room, called out to the prisoner, who thereupon entered the room of Kelland, who then, with much cursing and swearing, falsely accused him of stealing seventy-five cents from his Sunday pants that were hanging in the room; that the prisoner denied it and Kelland called him a liar; that the prisoner repeated his denial, and Kelland again called him a liar and pushed and struck him — struck three or four times— hard enough to knock him backwards; that the prisoner, excited, angry and hurt, rushed out of the room, and happening to see the brass faucet lying in the hall-way, seized it, and without reflection, rushed back into Kelland's room and struck him upon the head, knocked him down and stunned him; that then seeing what he had done, and alarmed, and having no money, he stole Kelland's money, watch and clothes and fled, not knowing whether he had fatally injured him. Upon this testimony of the prisoner his counsel claimed that the crime was not murder in the first degree, in that it lacked the elements of premeditation and deliberation, both of which must be present; and that the homicide was not committed while the prisoner was committing, or attempting to commit, larceny, since the idea of committing larceny did not enter his mind until after the homicide was committed.

The principal question in the case is whether the jury were properly instructed by the court, with respect to the aspects introduced into the case by the testimony of the prisoner. The court charged the jury : " If you find, as matter of fact, that the instrument of the nature of this in question was used by the prisoner, upon the head of the deceased, and blow after blow was struck by him on the head of the deceased, so that the skull was substantially crushed in from the use of that kind of instrument, under those circumstances and at that time, the law will permit you to draw as

an inference the fact that the man intended the natural and probable result of his act."

We find no error in this language to the prejudice of the prisoner. The law does permit the jury to draw the inference from the acts of a man that he intended the natural and probable result of his acts. How strong that inference may be must depend upon circumstances. If only one blow had been struck the inference might not be so strong as if many blows were struck. The law compels nothing. It only advises the jury to reason with respect to such acts, in that natural manner which human experience assures us leads to correct conclusions, but it does not compel the acceptance of the conclusion unless the mind is convinced. (*People* v. *Stover*, 56 N. Y., 315.) The court proceeded in the charge : " Self-defense is utterly out of this case by the prisoner's own showing; nothing of that kind appears ; on the contrary, it is negatived by what I told you is the prisoner's own statement. Those blows were not struck in self-defense, but, according to his statement, were struck in the heat of passion, on account of blows previously given to him by the deceased." Every sentence here was true and entirely appropriate.

The court continued : " Under those circumstances, where the fact of the killing stands admitted, and where the fact stands admitted that the killing was accomplished by virtue of that instrument which you have seen here, inflicting blows upon the head of the character which has been detailed ; and the rule of law being that from the infliction of such wounds, under those circumstances, you would be permitted to find, as matter of fact, that they were struck with an intent that the natural and probable result of those blows should follow ; and that natural and probable result being death, then it becomes necessary for the prisoner, on his part, to satisfy you, by a preponderance of the evidence in the case, that his statement of this crime is the correct one. Otherwise, you would be able to find from those facts, drawing the inference which the law permits you, that, as I say, the intention was to kill; and you would be permitted, under those circumstances, if it commended itself to your judgment, upon the evidence, to find that that intent existed sufficiently long before the perpetration to be premeditated and deliberate. I say, under those circumstances, the burden rests

upon the prisoner to show to your satisfaction, by a preponderance of the evidence, that his version of this story is the truth."

Was it necessary, regard being had to the very strong case made by the people, for the prisoner to satisfy the jury, by a preponderance of the evidence in the case, that his statement of this crime was the correct one; or, as the court again stated it, did the burden rest upon the prisoner to show to the satisfaction of the jury, by a preponderance of the evidence, that his version of the story was true? Suppose he did show it to the satisfaction of the jury, but not by a preponderance of evidence?

The court explained what was meant by a preponderance of evidence. "By a preponderance of evidence, of course, I do not mean the number of witnesses, because you have but one living witness to the actual occurrence that took place there that night, and that living witness is the prisoner at the bar. I do not mean that. I mean, taking all the facts and circumstances into consideration which this evidence gives you; taking all the inferences which you are entitled to draw from this evidence, and taking with it the evidence of the prisoner himself for what it may be worth in your judgment— all those facts, all those circumstances, all those inferences, and the testimony of the prisoner himself, are to be considered, and then, under those circumstances, you must say, having found the other facts that I have spoken of, that you are satisfied by a preponderance of the evidence in the case that the prisoner's version is the correct one."

The killing was conceded, and that it was unlawful was clear upon the prisoner's testimony. Under the indictment and the proof on the part of the people in order to find the prisoner guilty of murder in the first degree, it was necessary for the jury to find either that he killed Kelland while engaged in committing or attempting to commit a larceny, or from a deliberate and premeditated design to effect his death. The jury had both aspects of the case presented to their minds. In one aspect, the burden rested upon the people to prove either the commission, or attempt to commit the larceny, as the felony concurring with the homicide. The effect of the prisoner's testimony was in no wise directed towards disproving the killing, or the weapon with which it was done, or the repeated blows struck by the weapon. It touched

none of these, but went to disprove that part of the people's
case which tended to show that the larceny and the homicide
were concurrent acts. Now, there was no presumption of law
arising from the facts presented by the people that the intent to
commit larceny was prior to the act of killing. The facts, as
adduced by the people, tended strongly to show that it was, and the
testimony of the prisoner to show that it was not. The testimony
of the prisoner tended to weaken a necessary part of the people's
case, namely, the prior intent of larceny. He had the right to
attack that part of the people's case by his own testimony, and then
urge to the jury that his testimony was not only consistent with
that adduced by the people, but explanatory of it, and since the
burden always remained upon the people of making good that part
of their case, he had the right to explain away, if he could, the cir-
cumstances that seemed to press hard upon him if unexplained;
and having given his explanation he then had the right to have the
jury instructed that in determining the question whether he com-
mitted the homicide while engaged in committing, or attempting to
commit, a larceny, the burden rested upon the people; and whether
they had made it good or not, could only be determined upon a
consideration of all the evidence, including his own, and that upon
the whole case he was entitled to the benefit of a reasonable doubt
touching this element necessary to constitute murder in the first
degree. In like manner with reference to the other aspect in which
the jury may have found him guilty of murder in the first degree;
it was a part of the people's case to prove that he killed Kelland
from a deliberate and premeditated design to effect his death.
The fact of the killing, the weapon used, the violence and
number of times it was used, and many circumstances adduced
by the people, tended strongly to prove both premeditation and
deliberation. The rule that a man is presumed to contemplate the
natural and probable consequences of his own acts — a rule which
is but the formal expression of what our experience confirms, a
rule which is wise and advisory as to the conclusions reasonable and
proper to be drawn, but not a rule rigid and compulsory, enforcing
a conclusion as a presumption of law whether the mind of the
juror be convinced or not — tended strongly to produce the convic-
tion that the prisoner committed the homicide with deliberate and

premeditated design to effect Kelland's death. But the burden of proof as to this part of the people's case was never shifted from the people to the prisoner. And the prisoner had the right by his testimony to explain the circumstances and resist the inferences deducible from the case as made by the people, and to show that his version was not inconsistent with the people's case, and to urge that his explanation had weakened the force of the inferences which, with the circumstances unexplained, would naturally enough be drawn.

The question was not whether he had established his version of the case by a preponderance of evidence to the satisfaction of the jury, but whether in the light of his explanation, if the jury believed it, the people had made out that part of their case charging him with both premeditation and deliberation in committing the homicide. If upon this point the jury had a reasonable doubt they could not convict of murder in the first degree. It is true that the court immediately following the instruction to the jury, commented upon above, added: "And right here it is well for me to say to you, gentlemen, that the law not only permits but it directs you, if you have any reasonable doubt upon the evidence in this case, as to the guilt of this prisoner, as he stands indicted, it is your privilege and your duty to give to the prisoner the benefit of that doubt, and to acquit of the higher crime."

It is to be remarked that this instruction is not specially pointed to a doubt upon the question whether the homicide was deliberate or committed while engaged in the larceny; upon the evidence adduced by the prisoner as well as by the people, it may well have referred to the case made by the people alone. It is doubtful whether the jury could have understood from it that notwithstanding what the court had just instructed them as to the prisoner satisfying them that his version of the case was true, that if that version created a reasonable doubt as to the intent and character of the prisoner's act, they should give him the benefit of the doubt. Indeed, that the jury were not at liberty so to construe the language of the court seems to be placed beyond question by the subsequent request of the prisoner's counsel, and the response of the court. His counsel made this request: "I ask your honor to charge in that connection that the prisoner is entitled to the benefit of the

doubt in every proposition which the jury pass upon as a matter of fact, which distinguishes his charge from intentional, premeditated killing to a lesser degree of crime."

The COURT — "I won't charge exactly in that language. I will charge the jury as I think I have already charged, that the fact that the killing being admitted, and the proof being in regard to the killing, the use of this particular instrument and the blows thus administered, the jury would have the right to infer from such use and from the character of the instrument, that the party using them intended the natural result of their use; not that they are bound to as a matter of law, but that they have the right as matter of fact; if they should come to that conclusion and should infer such result was intended, then for the prisoner it rests upon him to satisfy you by a preponderance of evidence that his story is the correct one, and that he did not have that intention."

The prisoner's counsel stated that he took an exception to the words of the charge, that "the burden rests upon the prisoner that his version is the truth." To which the court remarked : "I say that the burden rests upon the prisoner to show that his version was the true one, if you should come to the conclusion, first, that this killing had been committed with this weapon; if it was a dangerous weapon, and the prisoner intended the natural and necessary result of his act, which was death."

COUNSEL — "I ask your honor to charge that the doubt is in the prisoner's favor on the question whether the prisoner's version is correct or not."

The COURT — "I won't alter my charge any in that respect."

It may well be that the jury convicted the prisoner because they did not believe a word of his version of the homicide; and if it could be seen that such was the case, we should not feel inclined to disturb this conviction. But it was the right of the prisoner to have his testimony so submitted to the jury as to allow them to give to it its proper effect in case they did believe it; or in case, when considered in connection with the whole evidence, it created a reasonable doubt in their minds as to the question whether the homicide was deliberate, or concurrent with another felony; or whether, to use the words of the court in *People* v. *Conroy* (97 N. Y., 75), it was "committed under the influence of sudden and

uncontrollable impulse produced by a proximate cause," and, therefore, less than murder in the first degree.

It is well-settled law that the burden of proof rests upon the people to establish the case charged; that where the crime consists of several degrees, this burden exists as to the degree charged, and as to every fact necessary to constitute that degree; and that if, upon the whole evidence, including that of the defense, as well as that of the prosecution, the jury entertain a reasonable doubt of the guilt of the accused, he is entitled to the benefit of that doubt; and this is true with respect to the degree of the crime charged, and with reference to every essential requisite of that degree, and that in all these respects the burden is never shifted from the prosecutor to the prisoner. (*Stokes* v. *People*, 53 N. Y., 164; *Brotherton* v. *The People*, 75 id., 159; *People* v. *McCann*, 16 id., 58; *People* v. *Conroy*, 97 id., 62–75; *People* v. *Schryver*, 42 id., 1.)

In the case of the *People* v. *Schryver*, the homicide was admitted and a justification was attempted. It was there held that the prisoner took upon himself the burden of satisfying the jury that his defense was true. The court, however, was careful to discriminate between an attempt to show that the homicide was manslaughter instead of murder, and an attempt to show that an admitted homicide was justifiable under the statute; thus plainly intimating that where the degree of the crime is to be established the burden still remains upon the people, but where the act admitted *per se* establishes the degree, a justification is an affirmative defense, and may not be accepted unless a reasonable probability of its truth is shown by the defendant, or arises upon the whole case.

But the case of the *Stokes* v. *People*, as also the other cases cited, seems to establish the rule that the burden does not rest upon the prisoner to establish, even to a reasonable probability, the truth of an affirmative defense; if upon the whole evidence upon both sides a reasonable doubt is created as to the guilt of the prisoner, he is entitled to the benefit of it.

We therefore feel constrained to reverse the conviction and judgment and direct a new trial.

LEARNED, P. J., and BOOKES, J., concurred.

Judgment and conviction reversed, new trial granted.