Danforth, J.
The defendant was convicted of murder in the first degree. . He alleges error on the part of the trial judge, first, in rejecting evidence to show that he was insane when the act was committed; second, in charging the jury; and these failing, asks for a new trial upon the ground that the verdict is so against the weight of evidence and against law that justice requires it. The homicide was-committed on the 1st of October, 1887, at the town of Islip. The trial came off on the fifth of December following, and one, Dr. Gray, being examined as a witness for the defense,, stated that about two weeks before that time he had visited the defendant, conversed with him and received a history of his case together with his symptoms. He was then asked by defendant’s counsel:
Q. “Was there anything that attracted your attention to-him in September last ?” A. “ Yes, sir.”
Q. “ What ?” A. “ His description of it to me.”
District attorney—“ I do not think it is proper to base a. question upon his description of how he was.”
The Court—“The prisoner is a competent witness for himself on that subject.”
Counsel for defendant: “ If the defendant was giving his-symptoms to the doctor historically, and without any suggestion on the part of the doctor, it seems to me that that would be more important and it would be more likely to be-truthful and sincere than any evidence we might bring here now for him. At least it is not subject to the criticism that-it has been suggested to him.”
The Court: I think it is the prisoner’s statement unsworn. *361 that is, he told the doctor so. But the symptoms, as he detailed them, get to the jury without the obligation of an oath. You may prove the symptoms by him, and then put them all in the form of a question to the doctor. I sustain the objection.
The same point is raised by a similar exception at a later stage of the trial. The ruling of the trial judge is well supported by the reason given by him. The prisoner’s declaration in November, as to his condition in September, was not competent as evidence of his actual condition at that time, nor could it be the basis of a scientific opinion as to whether he was sane or insane at that period. Had the question related to his condition at the time of the intervew, the result might be quite different. Everything said or done at a given period serves to disclose the mental state of the actor, but his narration as to what he said, or did, or of his feelings or bodily ailments upon a former occasion, furnishes no foundation for an opinion as to his actual state or condition at that time. It is of no higher grade than the declarations of third persons as to a past transaction, and in like manner is inadmissible. The witness was admitted to testify as an expert, concerning the mental condition of the person in question, and his opinion would be of value only when founded on facts observed by himself, or proved by other witnesses under the obligation of an oath, or upon hypothetical statements. To a certain extent an expert exercises the functions of a juror; his opinion is his verdict upon, the point submitted to him, and must be based on competent evidence. The representations of a sick person of the nature, symptoms and effects of any malady under which he is laboring at the time of making those representations, are sometimes received as original evidence; but I find no case which allows those representations to be received as evidence of his condition at any other period.
The defendant excepted to that part of the charge in which the word “deliberation” and the word “premeditation” were defined. In general but explicit words the learned judge first called the attention of the jury to the distinction between the crime of murder and the crime of manslaughter. Restating the conceded fact that “the defendant fired a shot at his mother,” he said: “If he intended to kill her, he committed murder. But, if under any state of mind, he fired a shot without that intent'to kill, then he committed manslaughter;” and adds, “if he committed manslaughter, he committed, as counsel for defense conceded, manslaughter in the first degree. ” The learned judge next explained the degrees of murder; that the first was “the taking of human life with deliberation and premeditation,” and referring to the temper and disposition of men as exhibited in different individuals, he recognized in some the considerate faculty, and the easy submission of others *362 to the impulse of anger, malice, or other violent passions, suggesting that the mind of one man is quick and active, enabling him to reach a conclusion as if by instinct, while that of another is sluggish, carrying him along slowly; “and, therefore,” he said, “it is left to the jury always to determine whether there was in the particular act sufficient deliberation in the mind of the particular individual who is on trial to warrant a conviction of murder in the first degree. When you come to define the word, all that the law requires is this, that there should be some reflection and some thought that precedes the blow. If there is thought, if there is reflection on the act, and if there is a choice and a determination as the result of those mental actions, then there is sufficient deliberation within the law.” The trial judge then read from the case of the People v. Conroy (97 N. Y., 62), the remarks of the learned chief judge of this court, in elucidating the meaning of these important qualifying words, and said: “You will apply that principle in this case. If you believe the evidence upon the part of the prosecution, there was deliberate preparation for this crime. On the other hand, if you believe the testimony of the prisoner as to the manner in which the crime was committed, I am inclined to think that it would indicate murder in the second degree. But still it goes to you as a question of fact for you to determine.”
The charge was full and comprehensive. No request was made for other instructions, and as to the accuracy of that given and its support by the evidence in the case, we entertain no doubt.
Upon the remainingpoint, that which presents the verdict as against evidence and leading to an unjust judgment, we cannot hesitate. We find it impossible to infer from the evidence that the act of the defendant, and for which he was indicted, was either unpremeditated or unintentioned. On the contrary we are brought by it to believe that the act was one he intended to do. We see throughout the testimony, whether it be that adduced by the people, or that given by the defendant, an intention matured by reflection and carried into execution by means, and upon an opportunity procured in pursuance of a defined plan. In its formation there was no haste, in its execution there was no exhibition of passion, emotion or impulse. His first step was accompanied by falsehood, and when the transaction was completed there was no manifestation of remorse. Informed of the suspicion that he had killed his mother, he replied, “you cannot prove it.” In all things he proceeded as calmly as in his narration upon the trial, when he told the story of the murder in a manner described by one of his own witnesses, 11 without a flicker of a muscle, except so far as was necessary to articulate.” His plan and *363 methods partook of that character. “The first thing,” says the learned counsel for the defendant, “ the first thing a sane man thinks of when planning a crime is how may the crime be committed and the identity of the criminal concealed.” That this was the thought and intention of the defendant seems not improbable when with confidence in his precautions, although conscious of his crime, he put the coroner to the proof. He trembled only when the discovery was made known to him, and he was charged with the offense. There was no substantial evidence of his insanity, though insanity was averred, and that question went to the jury. They found him sane, and they disbelieved his story. The record contains nothing which under any reasonable or fair construction would allow a different result.
He is confirmed in no particular, and every inference warranted by the evidence is opposed to his account of the homicide. The person killed was his mother. Until then she lived at Islip, where she kept house. At nine o’ clock Saturday evening, October 1st, she was in her sitting room reading. Her daughter, who had been with her, said good night and went to bed, leaving her in the room. The other members of the family had already retired, and it does not appear that she was afterwards seen alive by anyone save the defendant. The next morning her body, wounded to death by a pistol shot, was found lying by the roadside. The defendant lived at Bay Shore, where he was a clerk in his uncle’s store. The two places were about one mile apart. Between three and four o’clock on the afternoon of Saturday he engaged of S., a stable keeper at Bay Shore, a horse and calash top buggy, which he desired should be equipped with side curtains, to go, as he then said, to Babylon to meet Mr. Penny, a friend of his uncle, on the arrival of the late train. About nine o’clock in the evening he called for the team, paid for it and drove off. He returned to the stable a few minutes past eleven. He engaged the same rig for six o’clock Sunday morning. He came to the stable at that hour. Hear the stable was a pond, and he was then seen to throw something into the water. The lap robe which he had with him Saturday evening and the cushion were, upon examination the next day, found to be stained with blood, and blood was also found in other parts of the buggy. The carpet also had been saturated with blood, but had been wet with water. Foot prints found near the mother’s house and others near her body and at various places in the road between the two points, corresponded to the shoes of the horse driven by the defendant Saturday evening, and in his room were found his shirt and overcoat, each stained with blood. On *364 Monday the pond was searched and the defendant’s revolver found, one chamber loaded, the others discharged. The bullets found in the body corresponded with the calibre of the pistol. The defendant was arrested on Sunday, and being asked by the coroner to give an account of his whereabouts from the time of taking the buggy Saturday evening to the time of its return, described a route corresponding to that required by the intended destination as given to the stable keeper, but different from the one which he had actually taken, and which statement was shown in every respect to be false, but which if true would have excluded the idea that he had seen his mother on the night in question and would have established his innocence.
There was in these facts evidence of his guilt. But all possible doubt was dispelled when on Monday he confessed the killing of his mother. According to his statement, on leaving his uncle’s house Saturday evening and on his way to the stable, he drank two bottles of beer and carried with him two other bottles. In his overcoat pocket he had a pistol. From the stable he drove to his mother’s house, went in and spoke to her. She came out and both got into the wagon, and before going four or five rods they began to talk, and disagreed, as he said “they had from time to time he said they were talking about his engagement “ to a girl, and he was about to turn around to fetch his mother home when she called the girl a vile name,” and continues, this witness, to whom in the presence of others the confession was made, “ he said that quicker than thought he took his pistol from his pocket and put it within an inch of his mother’s head and shot her. He said she was looking right ahead ; don’t think she saw him at all. Don’t think that she knew when he pulled the pistol, but he shot her, and the cap, he told me, flew back and struck him on the nose. He said that she still breathed, and he drove down below Mr. G-unther’s down to the shore and he shot her again. He said she still breathed yet; he turned his horse and drove up the avenue, where he went down on to the Brentwood road, and as he got up to where he turned the horse, he says, he shot her again there ; there, he said, her breath just breathed right out, left her body. He said he turned his horse around and drove down to where she was. laid; he said he took and lifted her over the wheel and dropped her out of the wagon, and he drove from there to Mr. Penny’s to Babylon, and got a cigar,” and thence back and forth over various roads to the stable.
Upon the trial he was a witness in his own behalf. His testimony was not inconsistent in any material feature from the confession I have already given. He names additional circumstances, “that he went to his mother’s house on *365 Tuesday before the fatal Saturday to take orders for the store at which he was employed. He was then engaged to be married to one H. S.”
The wedding day was named, and on that Tuesday he says his mother said she wished to see him in reference to his marriage. He promised to be down on Saturday, and on that day engaged for that purpose a horse and wagon of S. He admits that he did not intend to go to Babylon, and that his statement to S. that he did was false. He drove from the stable directly to his mother’s house, put his horse under a neighboring shed, entered the kitchen and thence went to the sitting room where he found his mother alone and reading. She said “ good evening,” and kissed him. “ She asked if I had come over to see her about my marriage.” He said “yes,” and asked if the folks had gone to bed. She said “ yes.” “ I then asked if there was any danger of their coming down again. She said she didn’t know.” “I said that I had a horse-tied under the shed, and that I would have to pay for him anyhow, and we might just as well use him, and I asked her to go for a ride west.” She assented and got ready. By his advice she put out the light, and by his advice left the door unlocked. They left the house, entered the wagon, and he drove west. He recollects, he says, nothing of importance until his mother said, “I hear you are to be married soon,” and he said “yes, I am going to be married to-morrow.” She asked me who to, and I said Miss Hattie Schreck, at Northport.
Q. What then did she ask you ? A. She asked me how long I had been acquainted with this girl; I said a year and a half, or about a year. She asked me if she had any relations. I said no, or only one sister, who lived at North-port, who lived at Cold Spring.
Q. What then was said ? A. I said that Elbert Arthur took her out of an orphan asylum at New York, and had brought her up. She asked me if she had been well brought up; if she was well educated, and I said yes. Then she asked me if she was a Christian. I said no.
Q. What next occurred? A. Then she asked me—she told me that she had had other prospects for me, that I had been well brought up, and well educated, and she hoped that I would look higher fot a wife. I told her that I loved the girl and had engaged myself to her, and I intended to marry her. And she laughed at me, and said that I would get over it.
Q. What next was said? A. She asked me if she was virtuous; I said yes, she was, and I told her to take care for when she spoke of her honor she touched my heart; and then she asked me if there was anything, if there was not *366 anything that she could do to make me put off the marriage; I said no, there was not.
Q. What was next said? A. She wanted to know if there was not anything that she could do to make me put off the marriage and I said no, there was not.
Q. Well, what next did she say, if anything? A. She wanted to know if she was well-educated, and I said yes, she was.
Q. What remark did your mother make just before you shot her? A.' She said: “ Asbury, that girl is a low, base German prostitute.”
Q. What did you do? A. I drawed my revolver and fired.
Q. Was there the slightest premeditation at all? A. No, sir; there was not.
He then testified that he drove around in different directions and reached the stable with his horse at eleven of the clock. Thence he went to his room “where he changed his clothes,” “took a wash,” and “put on his Sunday clothes.” On further examination he said his pistol was in the coat pocket on his left side, next to his mother; he reached for it with his right hand, cocked and fired it. Nothwithstanding his statement that he fired three times, only one bullet or pistol wound was found.
How much of the story should be believed, what inferences should be drawn from it, the jury were to say. It was relied upon to show provocation and sudden passion. The mother knew of the intended marriage. She was a careful, considerate, good woman, affectionate to her son. It was proven that some weeks before this ride she knew of the intended marriage and disapproved of it; that she even considered whether in order to prevent it she should make such disposition of her property as would keep it from her son. It was the subject of conversation with her sister and with her daughter. Her conclusion was not to do so. It does not appear that this was known to the defendant. But in view of this knowledge of the mother and her opposition to the marriage, it might reasonably be inferred that before the night in question she knew the woman with whom it was to be contracted, and that such facts had reached her as laid the foundation for her disapproval.
“ Was it likely,” the jury might ask, “ that this mother, wishing nothing but good for her son, loving him and manifesting that love by affectionate demonstrations, would put to him a series of needless questions, asking for information as to the character and conduct of the girl, which she herself was able and prepared to answer. Were they bound to believe that this mother, having such information *367 as impelled her to speak as the defendant says she did speak, would lead him on to describe the person he professed to love and was about to marry, she at the same time being prepared to denounce her as a “ prostitute ? ” If the jury did not believe this, then there was no pretence or .semblance of a provocation, nothing to show that the act was done in the heat of passion or upon impulse, nothing to cast a shadow in the way of a conclusion that the act of ,the defendant was a premeditated and deliberate killing, constituting murder. So the jury regarded it, and we are unable to draw a different inference.
A new trial must therefore, be denied, and the judgment appealed from affirmed.
All concur.