# Court of Appeals.

*October*, 1884.

## PEOPLE v. CONROY.

(Affirming 2 *N. Y. Crim. Rep.* 247.)

MURDER—INDICTMENT.—EVIDENCE.—PREMEDITATION AND DE-
LIBERATION.—INTENT.—PLEADING.—APPEAL.

A witness not an expert, after testifying to certain acts of the accused in his presence, may state whether those acts were, in his judgment, rational or irrational.

It is not necessary to set forth in an indictment the particular intent with which a homicide is committed. It is sufficient to allege it to have been done feloniously, with malice aforethought, and contrary to the form of the statute.

An indictment which states all the facts necessary to constitute a crime

under the Penal Code, is not bad because it adopts the phraseology formerly in vogue, provided the matters alleged are set forth with sufficient clearness to inform the defendant of the charge he is required to answer.

The objection, that an indictment does not conform to sections 275, 276 of the Code of Criminal Procedure, must be taken by demurrer.

Where the judge instructs the jury that they must find the accused guilty or innocent under one count of an indictment, the appellate court will not consider whether the evidence would justify a conviction on another count not submitted to the jury.

In a case where conflicting questions of fact are passed on by the jury the defendant is entitled to a review of such facts by the General Term.

To show that the General Term, in granting a new trial on an appeal where questions of fact arising from conflicting evidence have been tried by a jury, granted such new trial on the facts, it is essential that its order should state that it has considered the facts and what is the result of such consideration. If it certifies that it finds no reason for granting a new trial upon the facts, and orders a new trial upon a question of law exclusively, such question may be properly brought to the Court of Appeals for review.

The general rule is that every homicide is presumed to be malicious and amounts to murder until the contrary appears from circumstances of alleviation, excuse or justification.

But when the commission of a homicide by the accused has been shown, it is for the jury to say from the facts and circumstances surrounding it, unless they clearly repel the idea of deliberation and premeditation, what the character of the act really was, and the degree of crime which should be attached to it.

The intention to commit a homicide which is not formed under the impulse of immediate provocation, or a sudden and instinctive apprehension of danger from some apparent cause, involves, to a certain extent, both deliberation and premeditation.

The lapse of no special period of time is necessary to infer the existence of deliberation and premeditation.

The jury has the right to find that the result produced, was the intended result of the act of accused, unless the evidence precludes such an intent.

If a person is undisturbed by sudden and uncontrollable emotions excited by an unexpected and observable cause, and is in the possession of his usual faculties, it will be presumed that his actions are prompted by reason, and are the result of causes operating on his mind and deemed by him sufficient to inspire his action.

Where the inferences to be drawn from the testimony are not clear and uncontrovertible, and men of ordinary judgment might differ as to its significance, it is the exclusive province of the jury to pass upon the questions involved.

Falsehood and evasion by the accused are proper evidence upon the question of his guilt or innocence.

APPEAL from an order of the General Term of the Supreme Court in the First Department of June 16, 1884, reversing a judgment of conviction of the Court of General Sessions of New York city of December 6, 1883, Hon. RUFUS B. COWING presiding, convicting defendant William Conroy of the crime of murder in the first degree.

The facts will be found in the opinions of the General Term, *ante*, p. 247.

The order of the General Term was in the following form:
" The above entitled criminal action having been brought on for argument upon the return made by the Court of General Sessions of the Peace in and for the city and county of New York, on the appeal taken herein from the judgment of the said court, and the said return being now before this court, and having been duly inspected by it, and upon said inspection it appearing to this court that certain errors of law were committed upon the trial of the above named appellant in the said Court of General Sessions of the Peace. After hearing William F. Howe, Esq., of counsel for the said appellant, and John Vincent, Esq., assistant district-attorney, of counsel for the respondents, and due deliberation being had thereupon :

" It is therefore ordered, adjudged and decreed, that for the errors of law aforesaid, so found in the said return and not for errors of fact or as matter of discretion, the judgment appealed from herein, be and the same hereby is reversed and set aside, and a new trial of the said appellant ordered to be had in the said Court of General Sessions of the Peace upon the indictment herein."

*Peter B. Olney*, district attorney (*John Vincent*, assistant), for the people, appellant.

*Wm. F. Howe*, for defendant, respondent.

RUGER, Ch. J.—The defendant was indicted and convicted in the Court of General Sessions of New York of the crime of

murder in the first degree, for having killed one Peter Keenan on the night of November 3, 1883, by means of a pistol. The killing was not denied, but it was urged in defense that there was an absence of that deliberation and premeditation essential to the commission of the crime charged, and that the defendant was insane at the time of its perpetration. The General Term reversed the conviction upon the ground that the evidence was insufficient to establish such deliberation and premeditation, and that such evidence was essential to justify a conviction under the indictment.

Although we differ with that court in reference to both the propositions stated, we are precluded from reversing its order upon that ground by a well founded exception taken by the defendant to the decision of the trial court, excluding certain evidence offered by him, and which requires us to affirm the order granting a new trial.

One of the defenses sought to be established upon the trial was the insanity of the defendant at the time of the commission of the offense. The witness Buckley had testified to the conduct and conversation of the defendant at an interview occurring between them earlier in the evening of the day on which the homicide occurred, and stated that he then drank two glasses of sherry with Conroy, and conversed with him for the space of one hour. He testified to the details of a long conversation in which the defendant appeared to talk in a rambling, incoherent and discursive manner. He was afterwards asked by the defendant's counsel the question: "Were his acts at 8 o'clock that night in your judgment rational or irrational?" This question was objected to by the counsel for the people, and the objection was sustained by the court, to which the defendant excepted.*

* The evidence referred to is as follows:

Q. Did he speak coherently or incoherently ?

A. Well, he talked like a person that was not right in the head.

Q. Were his acts at 8 o'clock that night in your judgment rational or irrational ?

Objected to, Objection sustained, Prisoner's counsel excepts.

By the COURT:

Q. From what you have stated and given to this jury, what in your

This evidence called for by this question was pertinent upon the issue of the defendant's insanity, and the witness was competent to give his opinion to the character of the conduct and conversation which he had observed. How much or how little the answer might have influenced the jury if the witness had been permitted to give it, we are unable to conjecture. The jurors might have considered it important, or in the exercise of their judgment might have disregarded it as of no material weight. The question of defendant's sanity was one upon which the jury was required to pass, and the defendant was entitled to give such competent evidence as he possessed upon that question, and this privilege was denied him.

The rule regulating the admissibility of the opinions of non-expert witnesses upon questions affecting the mental condition of individuals, is well stated in the opinion of Judge PORTER in Clapp v. Fullerton, 34 *N. Y.* 190. He says : " When a layman is examined as to facts within his own knowledge and observation, tending to show the soundness or unsoundness of the testator's mind, he may characterize as rational or irrational the acts and declarations to which he testified." " But to render his opinion admissible, even to this extent, it must be limited to his conclusions from the specific facts he discloses." The rule thus expressed was followed and approved in the cases of O'Brien v. People, 36 *N. Y.* 282, and Hewlett v. Wood, 55 *N. Y* 634.

This question was recently examined and discussed in this court in the case of Holcomb v. Holcomb, 95 *N. Y.* 316, and

---

judgment was his condition at 8 o'clock, based on what you have stated ?

A. Yes, sir; in my judgment, by his talking about bricks and fighting, I did not think he was right.

By Mr. FELLOWS (for the people):

Q. The question is, was he crazy ?

A. He acted like a crazy man.

By Mr. HOWE:

Q. He acted like a crazy man, was your answer ?

A. Yes, sir.

By the COURT:

Q. What was your answer ?

A. I said he acted like a crazy man.

the rule, as above stated, was approved, and our conclusion upon this question leads to an affirmance of the General Term order. A new trial, therefore, being necessary, its exigencies require us to examine the conclusions reached by the General Term in ordering it, and to state our reasons for differing with the views expressed in the prevailing opinion of that court, upon which such order was based.

The Penal Code (§ 183) declares that, "the killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed either from a deliberate or premeditated design to effect the death of the person killed, or of another, or by an act immediately dangerous to others and evincing a depraved mind regardless of human life, although without a premeditated design to effect the death of any individual." Other cases, not important here to refer to, are also described in the statute.

This indictment contained two counts, one alleging, substantially, that the defendant shot off and discharged a pistol at Peter Keenan, resulting in his death, "with a deliberate and premeditated design to" effect his death. The second count charged, in substance, that the defendant committed the crime of murder in the first degree, in the First Ward of the city and county of New York, on November 3, 1882, by feloniously, willfully, and with malice aforethought, shooting one Peter Keenan with a bullet discharged by him from a pistol, and thereby inflicting upon said Keenan a mortal wound, whereof he died on November 4, 1883; that said killing was done willfully, feloniously, and of his malice aforethought and contrary to the form of the statute in such case made and provided." This count seems to contain all of the allegations necessary to describe the crime of murder in the first degree, as defined in the Penal Code. The requisites of a good indictment are prescribed by section 275 of the Code of Criminal Procedure, and are the following: "The indictment must contain: 1st. The title of the action, specifying the name of the court to which the indictment is presented, and the names of the parties. 2d. A plain and concise statement of the act constituting the crime, without unnecessary repetition.

Section 284 provides with reference to objections, which

may be made to an indictment for defects in the description of the offense, that it is sufficient, if it can be understood therefrom : " 6th. That the act or omission charged as the crime is plainly and concisely set forth. 7th. That the act or omission charged as the crime, is stated with such a degree of certainty as to enable the court to pronounce judgment upon a conviction according to the right of the case."

The act through which the crime in this case was effected is fully described in the second count of the indictment, and is charged to have constituted the crime of murder in the first degree, and to have been done feloniously, with malice aforethought, and contrary to the form of the statute in such cases made and provided.

It has never been required under the strictest and most technical rules of pleading that the particular intent with which a homicide was committed should be set forth in the indictment ; but it has uniformly been deemed sufficient to allege it to have been done feloniously, with malice aforethought, and contrary to the form of the statute. People v. Enoch, 13 *Wend.* 159; People v. Kennedy, 32 *N. Y.* 145; People v. Fitzgerrold, 37 *N. Y.* 413.

The question as to whether the crime was committed under such circumstances, with reference to intent, as makes it murder in the first degree, within the statutory definition, has been held, under several changes of the statute, defining that crime to be one of evidence determinable by the jury under the instructions of the court. People v. Enoch, *supra.* Judge WOODRUFF, in Fitzgerrold v. People, *supra*, commenting upon the case of People v. Enoch and others, says: " The result of these cases most clearly is, that the crime of murder is sufficiently charged when alleged as in the present indictment, ' with malice aforethought.' But in order to prove the crime, the proof must establish a case within the requirement of the statute in one of its three subdivisions, and the party indicted is entitled to proper instructions to the jury as to what facts must be found to sustain the indictment." There would seem to be no reason why the form of an indictment which was considered sufficient under the strict and technical system of pleading formerly prevailing, and which required the allegation of

every essential fact constituting the crime, should be deemed insufficient under a system directed to the simplification of criminal proceedings, for the avowed purpose of obviating a failure of justice, which had sometimes occurred through the technicalities of an artificial and complex mode of procedure. It was not intended by the section of the Code of Criminal Procedure abolishing existing forms of pleading in criminal actions to obliterate forms of expression or the judicial construction theretofore given to the language employed in such pleadings ; but its true office was to abrogate the technical rules formerly governing the construction of criminal pleadings, and to substitute therefor the simplicity and liberality of interpretation presented by the new system of criminal procedure.

In the first report made by the commissioners of the Penal Code to the Legislature in 1850 the following form, aside from its formal parts for an indictment for murder in the first degree, was recommended, viz :

" A. B. is accused by the Grand Jury of the county of ———— by this indictment of the crime of murder in the first degree, committed as follows : The said A. B., on the —— day of ————, 1850, at the City of ————, in this County, without the authority of law, and with malice aforethought, killed C. D. by shooting him with a pistol."

The commissioners say in a note to the form that " the words ' malice aforethought ' are used in the same sense in which they are understood in the existing form of indictments for murder, and are intended to comprehend the several divisions of that offense as it is defined by statute."

While the construction given by the commissioners of the Code is not deemed authority on the question of its interpretation, it is yet entitled to high consideration in determining the meaning and intent of the statute. An indictment which now states all of the facts necessary to constitute a crime under th Penal Code is not bad, because in the statement it adopts th phraseology formerly in vogue, provided, by the usual an natural import of the language, the matters intended to be alleged are communicated with sufficient clearness to fully inform the defendant of the charge which he is required to answer.

The form adopted in this case was the old common law form of pleading, which has been uniformly approved as sufficient, by the courts of this State through all the statutory changes in the definition of the crime of murder, and embraces all the allegations deemed material by the authors of the Code. It is undoubtedly the better way of pleading to charge the crime to have been committed with one of the several intents described in the Code, but we are of the opinion that it is sufficient if the description of the offense be stated in the language employed in the second count of this indictment.

No demurrer was interposed to this count by the defendant, and the objection that it did not conform to the requirements of sections 275 and 276 of the Code of Criminal Procedure could be taken only by demurrer. *Code of Crim. Pro.* § 331.

It is now claimed by the people that, notwithstanding the abolition of the prior form of pleading in criminal actions effected by section 273 of the Code, that a conviction for murder in the first degree may be sustained under the second count of this indictment, if the evidence justifies it, even though it were insufficient to sustain all of the allegations charged in the first count. We fail to see how the people can be aided in this appeal by our conclusion as to the sufficiency of the second count, inasmuch as the question of fact thereby presented has not been tried and determined in the trial court.

The court on the trial substantially instructed the jury to find a verdict of not guilty, unless they could come to the conclusion that the shooting was done with a deliberate and premeditated design to effect the death of Keenan, as charged in the first count ; and that question, with the defense thereto, alone was submitted to the jury. Even if we were of the opinion, therefore, that the evidence authorized the jury to convict, under the second count of killing " by an act immediately dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of an individual," we could not for that reason reverse the judgment of the General Term, since the questions of fact involved have not been submitted to the jury, or passed upon by the General Term. Home Insurance Co. *v.* Western Trans. Co., 51 *N. Y.* 93 ; Stapenhorst *v.* Wolff, 65 *Id.* 596.

The General Term did not reverse the conviction upon the facts, as it might have done, but a majority of that court came to the conclusion that the evidence was insufficient in law to authorize a conviction under the first count of the indictment, and reversed the judgment upon that ground.

Although we cannot agree with the views expressed by the General Term upon the question of sufficiency of the evidence of deliberation and premeditation proved against the defendant upon the trial, we would have hesitated greatly before reversing an order granting a new trial upon that ground, on account of our reluctance in a capital case to render such a decision unless it is absolutely necessary to prevent a failure of justice. The high regard which courts entertain for the rights of parties accused of crimes will always render this court reluctant to interfere with an order granting a new trial in a capital case where the necessary effect of such a cause will be to deprive a human being of life. In such cases it is wiser and better practice on the part of the public prosecutor, unless the determination of the court below proceeds upon grounds which must necessarily be fatal to the prosecution upon a new trial, to acquiesce in the decision of the General Term, and proceed with the re-trial.

It also seems proper in this case to comment upon the form of the order appealed from, and suggest again what we consider to be the appropriate formula to be used in cases in which a review of questions of law by this court in criminal cases is desired. The present order certifies " that for the errors of law aforesaid, so found in the said return, and not for errors of fact, or as matter of discretion, the judgment appealed from herein, be, and the same hereby is, reversed and set aside, and a new trial of the said appellant ordered to be had." In a case where questions of fact arising upon conflicting evidence are tried and determined by the jury, a defendant is entitled to a review and determination of such questions by the General Term. In this case the defendant had taken the necessary steps to secure his right and ought not to be deprived of it. Such a review has not been had, and we cannot say that the General Term would not have granted a new trial upon the evidence if it had supposed the ground of the decision actually adopted by it was erroneous. It is essential that the order made by that court

should state that it had considered the case upon the facts and the result of such consideration. If it certifies that it finds no reason for granting a new trial upon the facts, and then orders a new trial upon a question of law exclusively, that question may properly be brought to this court for review. The reasons for this rule are fully explained by Judge RAPALLO in the case of Harris v. Burdett, 73 *N. Y.* 136, and need not here be repeated or elaborated.

Recurring to the question discussed in the court belów, we are of the opinion that the jury was justified in inferring from the facts and circumstances proved, that the death of Keenan was the result of deliberation and premeditation on the part of the defendant.

The evidence tended to show that the defendant had been a policeman in the city of New York several months, performing the duty of a patrolman. On the night of the homicide, about half-past eleven, he passed the saloon of one Cody, in which were assembled some fifteen or more persons, and was informed that one Murphy had been treating the crowd, and that he was entitled to a drink.

He entered the saloon with some friends, and drank a small glass of sherry. He was conscious of a violation of duty in going into the saloon, and in reply to some one who interrogated him as to what he would do in case he was discovered, replied that he should run him in. Almost immediately thereafter he commenced an abusive controversy with one Cantwell, and proposed to fight with him. He then produced some money, and offered to bet that he could whip any man in the room. No one accepted his offer. He invited the party to drink, and when the charge for the treat was stated to him, he angrily disputed it, and commenced polling the persons present to determine how many had drank upon his invitation. When one McGinnis stated that he had drank a glass of mixed ale, defendant called him a G—d d—d liar, and upon McGinnis retorting " You are another," knocked him down and kicked him. The crowd interposed to protect McGinnis, and gathered around the defendant, whereupon, he drew his club, and drove all except Cody, Keenan, Buckley, Keating and Cantwell from the room into a card-room adjoining. Some one else in the

card-room then attempted to open the door and look into the saloon, whereupon the defendant struck at him with his club, and broke a pane of glass in the door. He then pushed the door open and struck at the people in the card-room. Immediately after this he stepped backward into the saloon three or four paces, and, putting his hand into his hip pocket, endeavored to pull out his revolver. The witness, Keating, then expostulated with him, and said, " For God's sake, Billy, don't fire ; those are friends of mine." He continued his efforts, but the attempt was obstructed by the instrument catching in his pocket. He soon, however, released it, and in the language of the witness, Cody, " turned to the left and leveled his revolver in the direction ; by that I beckoned at my wife to go back when I saw the revolver pointed in the direction where she was, and Keenan and Cantwell. I spoke to her, and during the time I was speaking, the revolver was fired." He fired the shot and Keenan staggered back, and he said " I am gone." Cantwell, who stook near Keenan, says, "I could not say whether he fired at me or Keenan, but he turned toward us." The defendant, with Buckley and Keating, then went into the street, and, seeing two or three boys running away from the vicinity, threw his club and discharged three or four shots from his revolver at them. Reinforced by two policemen, to whom he stated that he had been fighting a mob, he returned to the saloon, where he was informed that a man had been shot. He there saw two men and inquired, " Ain't those two of the mob ?" Being answered by Buckley that he had seen no mob that night, he said, " I have been hit with bricks, haven't I ?" Buckley replied, " No." The defendant then gave the two men into the custody of his associates, and finding Keenan lying behind the bar, pulled him up by the lappel of his coat and compelled him to walk to the station-house. The evidence tended to show that he clubbed Keenan severely on the way, and inflicted bruises on his face, head and neck. On arriving at the station-house, Conroy stated to the police in charge that he was assaulted by a crowd of roughs in Thirty-sixth street, between First and Second avenues, while attempting to arrest Keenan for drunken and disorderly conduct. He charged that Keenan was drunk, and collected a crowd and used profane

language. About the same time, in an interview with Capt. Ryan, a policeman, he stated that he arrested a man of the name of Keenan for being drunk and disorderly ; "as I had him arrested, he assaulted me, and the crowd rushed on to me and took him away. I then drew my pistol and fired into the crowd, and I happened to shoot this man." Soon after his arrival at the station, he had a conversation with Sergeant Cassidy, in which he stated that he arrested Keenan for being drunk and disorderly ; that he was attacked by a crowd and his prisoner rescued. Upon being asked "Is this man shot ?" he replied, " Well, I don't know ; if he is not, it is not my fault, I tried hard enough to shoot him."

It was undoubtedly essential under the first count of the indictment, that effect should be given to both of the words deliberation and premeditation as used in the statute ; and that the act should have been proved to have been deliberate in the sense that it should not have been committed under the influence of sudden and uncontrollable impulse produced by a proximate cause ; and premeditated in the sense that an intention to inflict injury must have preceded the doing of the act which effected death. It is a general rule, however, that all homicide is presumed to be malicious, and, of course, amounting to murder, until the contrary appeared from circumstances of alleviation, excuse or justification. *Russell on Crimes,* 483 ; 2 *Black. Com.* 201 ; Rex *v.* Greenacre, 34 *Eng. C. L. Rep.* 280 ; Hill's Case, 2 *Grattan,* 594 ; People *v.* McLeod, 1 *Hill,* 436.

It was, however, held in People *v.* Stokes, 53 *N. Y.* 164, that a charge stating that " The fact of killing in this case being substantially conceded, it becomes the duty of the prisoner here to satisfy you that it was not murder, which the law would imply from the fact of the killing, under the circumstances, in the absence of explanation that it was manslaughter in the third degree, or justifiable homicide," was erroneous, because it relieved the prosecution from the burden of proving the killing to have been premeditated, and imposed the obligation upon the defendant of showing affirmatively that the homicide was effected under such circumstances as excused or justified the defendant. The effect of this decision undoubtedly requires the public prosecutor on the trial of an indictment for murder

in the first degree to prove all of the essential facts required by the statute to make out the crime. But when the commission of a homicide by a person accused has been shown, it is the province of the jury to say from the facts and circumstances surrounding it, unless they clearly repel the idea of deliberation and premeditation, what the character of the act really was, and the degree of crime which should be attached to it. In other words, there is no legal presumption arising from proof of the mere commission of a homicide, which concludes the jury from finding upon that evidence alone that there was not such deliberation and premeditation as constitutes the crime of murder in the first degree, or but that the act was justifiable or excusable.

The intention to commit a homicide which is not formed under the impulse of immediate provocation, or a sudden and instinctive apprehension of danger from some apparent cause, would seem to involve, to a certain extent, both deliberation and premeditation. The terms are not the creation of our statute, but were considered essential elements of the crime at common law. It was said by Judge JOHNSON, in People v. Clark, 7 N. Y. 393 : " If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design is formed at the instant of striking the fatal blow, or whether it be contemplated for months. It is enough that the intention precedes the act, although that follows immediately." Judge DANFORTH says : "If the killing is not the instant effect of impulse, if there is hesitation or doubt to overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." Leighton v. People, 88 N. Y. 117. In People v. Majone, 91 N. Y. 211, Judge EARL says : " Under the statute there must be not only an intention to kill, but there must also be a deliberate and premeditated design to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection or consideration upon the matter for choice to kill or not to kill, and for the formation of a definite purpose

to kill. The human mind acts with celerity which is sometimes impossible to measure, and whether a deliberate or premeditated design to kill was formed must be determined from all the circumstances of the case."

We think evidence was given upon the trial from which the jury was authorized to find either way upon the question of deliberation and premeditation. The circumstances of the crime showed no apparent cause for its commission, the defendant having had no previous difficulty with the deceased, and he at the time was not engaged in any act calculated to provoke the hostility or anger of the defendant.

It is suggested that the defendant had no motive for killing Keenan. To this it is sufficient to say that he had no apparent motive for killing any one, and there is no evidence tending to show that he intended to kill some other person, or that he did not intend to kill the person whom he actually killed. The existence of malice is to be inferred from the perpetration of the deed ; the corrupt disregard of the person and life of another is precisely the dole or malice, the depraved wicked purpose, which the law requires and is content with. 2 *Hume*, 254; *Starkie on Evidence*, 663.

In capital as well as other cases it must be held that a person intends that which is the natural and necessary consequence of an act done by him, and unless the act was done under circumstances which preclude the existence of such an intent, the jury had the right to find from the result produced an intention to effect it.

Whenever intent is made an element in determining the character of an act, it is in accordance with our general observation and experience to infer its existence by reference to the laws which have been usually and generally found to control human conduct ; indeed, this is the only method by which the intent can be made to appear.

The intent formed is the secret, silent operation of the mind, and its only visible physical manifestation is in the accomplishment of the thing determined upon. The individual whose intent is sought to be ascertained may remain silent, or, if he speaks, may, and probably will, if he has a crime to conceal, speak untruly, and thus the mind is com-

pelled from necessity to revert to the actual physical mani-
festations of the intent, exhibited by the result produced
as the safest, if not the only proof of the fact to be ascer-
tained.

This rule is always applied, unless from the circumstances
of the case, it affirmatively appears that the will of the actor
was subordinated to some controlling and irresistible cause
precluding the existence of any voluntary mental action. In
*Starkie on Evidence* it is said, " that a rational agent must be
taken to contemplate and intend the natural and immediate
consequences of his own act, is a presumption so cogent as to
constitute rather a rule of law than of mere evidence," p. 848.
" There is a general presumption in criminal matters that a
person intends whatever is the natural and probable consequen-
ces of his own action." 1 *Philips Ev.* p. 632. It was said by
Judge ANDREWS that " It is a fundamental rule of evidence of
very general application, founded upon observation and ex-
perience, that a man is presumed to intend the natural conse-
quences of his act," in Foster *v.* People, 50 *N. Y.* 609.

The proof in this case tended to show that the defendant,
knowing the location of the deceased, drew a pistol, a neces-
sarily dangerous weapon, from his pocker with some difficulty,
turned round toward Keenan and discharged it, and that the
pistol ball entered a vital part and caused Keenan's death. It
can hardly be conceived that the defendant was ignorant either
of the presence of Keenan, the dangerous character of the
weapon used by him, or the necessary effect of the discharge of
a ball therefrom into the body of a human being.

It was competent for the jury to find from the circum-
stances that the defendant had a purpose formed, after more or
less deliberation, at the time his hand moved in obedience to the
suggestion of his mind to take the pistol from his pocket, and
that his purpose influenced him during the time he was
releasing his pistol from his pocket, and while he was convoy-
ing it from its usual receptable to the position from which it
was discharged at Keenan.

It is not known that there was any-one in the direction to-
ward which he discharged his bullet against whom he enter-
tained animosity more than he did toward Keenan. There was

therefore no controlling or probable reason for supposing that he intended to kill any other person than the one he killed. To infer the existence of deliberation and premeditation does not require the lapse of any special period of time. If a person is undisturbed by sudden and uncontrollable emotions, excited by an unexpected and observable cause, and is in the possession of his usual faculties, it will be presumed that his actions are prompted by reason and are the result of causes operating upon his mind and deemed sufficient by him to inspire his action. A sane person who, meeting a stranger upon the street, and in the absence of a sudden impulse produced by an observable cause, without words of explanation or warning, immediately draws a deadly weapon and therewith causes death, would unquestionably bring himself within the penalties prescribed for the punishment of the crime of murder in the first degree. Under such circumstances it would be impossible to conceive of a voluntary act, the commission of which requires physical exertion as being independent of mental operation and unaccompanied by a mental determination to perform such act and an incidental reflection as to the means to be employed in its accomplishment. Short as was the time occupied in the present case between the effort to get the pistol and its use, the bystander, Keating, realized the consequences and vainly attempted to avert them.

The natural laws which govern human action tend to show that when the defendant attempted to remove the pistol from his pocket he had a design to accomplish. The period during which his effort to get the pistol was obstructed by its catching in the lining prolonged the period of his reflection, and notwithstanding the remonstrances of Keating, his design held its sway until the weapon was discharged. It required mental effort to realize that he had a pistol, to contemplate its use, and to appreciate the existence of a cause for its production at that time.

The defendant's motions apparently were not controlled by involuntary impulse produced by mental emotion or by instinctive action adopted under a sudden apprehension of danger, for no causes appear to exist accounting for such action, and the jury had the right to infer from the circumstances that they

were the result of such deliberation and premeditation as brought the act within the meaning of the statute.

The evidence of intent is also corroborated by the conversation and conduct of the defendant after the commission of the crime. That evidence tends to show that the defendant immediately commenced to invent a scheme to justify his conduct, and without cause other than conscious guilt to adopt a line of conduct intended to convey false impressions as to the circumstances of the crime.

In pursuance of this scheme he made many false statements, and some that were contradictory as well as false. He quite deliberately gave two versions of the reason which induced him to shoot the deceased, in one of which he claimed that the killing was unintentional, and in the other that it was intentional. When the court below assumed to decide which of these statements was true, or that they were both false, we think it usurped the province of the jury, and gave a construction to evidence susceptible of different interpretation and which it was the exclusive right or the jury to give.

Where the inferences to be drawn from the testimony are not clear and incontrovertible, and men of ordinary judgment and discretion might differ as to its significance, it is the exclusive province of the jury to pass upon the questions involved. Thurber *v.* Harlem R. R. Co., 60 *N. Y.* 331; Morrison *v.* Erie Railway Co., 56 *N. Y.* 308.

When the consequences of his act began to be appreciated by the defendant he turned to falsehood as his defense, and, as often happens in such cases, involved himself in contradictory statements in his efforts to escape the imputation of crime.

The result of falsehood and evasion, by one accused of a crime, affords of itself a presumption of evil intentions, and has always been considered proper evidence to present to a jury upon the question of the guilt or innocence of the person accused. U. S. *v.* Randall, *Deady*, 524; State *v.* Reed, 62 *Maine*, 129; Commonwealth *v.* Goodwin, 14 *Gray*, 55.

The falsity of the various accounts given by the defendant, of the circumstances attending the commission of the crime, so far from modifying the force of the express admission of

Conroy that he intended to shoot Keenan, gives it additional weight, and would of itself afford sufficient ground to authorize an inference of his guilt by the jury.

Although the evidence shows that the defendant had been drinking during the evening, it does not show that he had become intoxicated, or that the liquor taken by him had obscured his reason or weakened his intellect. The readiness with which he saw the danger his conduct had brought upon him, and the promptitude with which he adopted precautions to obviate it, were circumstances from which a jury might well conclude that he perpetrated the act with an understanding of its consequences and a reckless disposition to brave them.

We approve of the disposition made by the General Term of the remaining questions in the case; but for the reasons stated the order directing a new trial must be affirmed.

All concur.