PEOPLE, PLAINTIFF AND APPELLEE, *v.* IZQUIERDO, DEFENDANT
AND APPELLANT.

APPEAL from the District Court of Mayagüez in a Prosecution
for Murder in the First Degree.

No. 1103.—Decided June 14, 1917.

MURDER—BURGLARY—EVIDENCE—INFORMATION.—Under an information charging
the accused with having taken the life of a human being unlawfully, wil-
fully, with malice aforethought and with the fixed and deliberate purpose
of doing so, showing a perverted and wicked heart, it may be proved that
the murder was committed while in the act of committing burglary.

ID.—EVIDENCE.—The accused contended that the evidence was insufficient to
convict, but after examining said evidence it was' held that the verdict of
the jury should not be disturbed.

The facts are stated in the opinion.

*Mr. Antonio Trujillo Güil* for the appellant.

*Mr. Salvador Mestre, fiscal,* for the appellee.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is a case in which the defendant was sentenced to
death. The information, so far as pertinent, reads:

"During the night of the 7th of August, 1915,. in the ward of
Colombia of the Municipality of Mayagüez, P. R., within the juris-
diction of the District Court of Mayagüez, P. R., the said defendant,
Rufino Izquierdo, unlawfully, wilfully and with malice aforethought
and fixed and deliberate intent, showing that he possessed a wicked
and perverted heart, did then and there kill and murder Ramón.
Mercado y Carbonell, a child known also as Ramón Valentín, a
human being, with a club or bludgeon, inflicting with the said instru-
ment a contused wound in the right malar region, which produced
a fracture of the superior maxillary bone at the base of the skull,
affecting the entire spheroid bone and producing a profuse hem-
orrhage, which was the cause of the unlawful and instantaneous death
of the said Ramón Mercado Carbonell, known also as Ramón
Valentín."

. The accused pleaded not guilty. A trial by jury was had.
and after hearing the pleadings, the evidence, the charge of.
the court and the arguments of the parties, the jury returned.
its verdict finding the accused guilty of murder in the first

degree. The court, in due course, rendered judgment sentencing the defendant to death.

The evidence was circumstantial and tended to show that the crime was committed in the perpetration of burglary in the first degree. The court gave the following instructions, among others, to the jury:

"So, gentlemen of the jury, there are three kinds of murder in the first degree: when committed by lying in wait, poison or torture, which you are not called upon to consider because there is no evidence tending to show that the death was caused by lying in wait, poison or torture; second, when committed in perpetrating, or attempting to perpetrate, arson, rape, burglary, robbery, or mayhem; and, finally, by any other kind of wilful, deliberate and premeditated killing. What you have to consider, gentlemen of the jury, is the second class of murder in the first degree, committed in perpetrating or attempting to perpetrate burglary or robbery. You are not to consider the third class because no evidence has been introduced in this case to show a premeditated and deliberate intent to kill, or that the defendant had premeditated or designed the perpetration of this murder.

"The court instructs the jury that when the murder is committed in the perpetration or attempted perpetration of robbery or burglary, there then exists conclusive evidence of premeditation and deliberation on the part of the slayer, and whether the murder was committed wilfully, deliberately and with premeditation is answered by the code itself and the jury has no alternative but to find the defendant guilty of murder in the first degree."

The appellant contends that the evidence was insufficient and that there was such variance between the information and the proof as to obstruct the defendant in his defense, and for both or either of these reasons he prays for the reversal of the judgment appealed from. We will first consider the question of variance and then the evidence.

In effect, the information charges that Rufino Izquierdo wilfully, with malice aforethought and with fixed and deliberate intent, showing that he possessed a wicked and perverted heart, unlawfully killed the child Ramón Mercado, and the evidence tends to show that the murder was commit-

ted in perpetrating the crime of burglary. Is this a funda-
mental variance which obstructs the accused in his defense?
Is it necessary in a prosecution for murder committed in the
perpetration of arson, rape, burglary, robbery, or mayhem
to allege this fact in the information? Are the instructions
transcribed herein erroneous? There is an abundance of
jurisprudence on these questions.

In the case of *People* v. *Giblin,* 4 L. R. A. 757, Mr. Justice
Gray, in delivering the opinion of the Court of Appeals of
New York, said:

" * * * The indictment was drawn in common-law form, and
in one count charged the killing to have been done wilfully, felon-
iously and with malice aforethought. The defendant objected that
such an indictment was not sufficient to sustain the conviction of
the defendant for the offense of murder in the first degree while
engaged in the commission of the felonious assault upon Valentine
Goelz. He argues that the offense is defined by the statute in the
alternative, as consisting of separate acts, and the indictment should
have stated the circumstances constituting the offense according to
the third alternative provision of section 183 of the Penal Code,
which makes the killing of a human being murder in the first degree,
when committed without a design to effect death, by a person en-
gaged in the commission of, or in an attempt to commit, a felony.

"The objection to the indictment is untenable. A conviction of
murder in the first degree under such an indictment is sustained by
proof of a killing in the perpetration of a felony. *People* v. *Conroy.*
97 N. Y. 62; *People* v. *Willett,* 102 N. Y. 254, 2 Cent. Rep. 890.

"If the indictment contains a plain and concise statement of
the act constituting the crime, and the proof as to the manner in
which it was perpetrated brings it within one of the statutory defini-
tions of murder in the first degree, the requirements of the law are
sufficiently met." 4 L. R. A. 758.

In *State* v. *Johnson,* 34 N. W. Rep. 177, the Supreme Court
of Iowa said:

"The indictment is in two counts; each alleging premeditation,
and other necessary ingredients of the crime of murder in the first
degree. The second count further alleged that the killing was by
lying in wait. There is no allegation in either that the crime was

committed in the perpetration of arson, rape, robbery, mayhem or burglary. The court directed the jury that, if they found that the killing was done in the perpetration of a robbery, it was murder in the first degree. Counsel insist that, in the absence of an allegation in the indictment that the killing was in the perpetration of robbery, the finding of such fact would not authorize a verdict for murder in the first degree. We are of a different opinion. The indictment sufficiently alleges that the killing amounted to murder in the first degree. It was not necessary to allege the facts and circumstances attending the crime. The indictment sufficiently supported the proof of facts which constituted the killing-murder in the first degree, and under it proof was competent to show the crime was committed in the perpetration of robbery.'' 34 N. W. Rep. 181.

In *Wilkins* v. *State,* 34 S. W. Rep. 627, the Criminal Court of Appeals of Texas said:

''The charge of the court is objected to because it instructs the jury that 'all murder committed with express malice is murder in the first degree'; and 'the law declares that all murder committed in the perpetration or attempted perpetration of robbery is murder in the first degree.' The last sentence is objected to because the indictment in this case only charges this defendant with murder with malice aforethought, and nowhere charges this defendant with murder in committing or attempting to commit the offense of robbery. The contention of the appellant in both particulars has been decided against him. See *Sharpe* v. *State,* 17 Tex. App. 486; *Giles* v. *State,* 23 Tex. App. 281, 4 S. W. 886. There was no error in defining robbery, because it is settled that under the indictment charging murder with malice aforethought the accused can be convicted of murder in the first degree if it were in the perpetration or attempted perpetration of robbery. It was the duty of the court to define robbery.'' 34 S. W. Rep. 628.

The same doctrine was laid down by the Supreme Court of Missouri in the cases of *State* v. *Foster,* 38 S. W. Rep. 721, and *State* v. *Meyers,* 12 S. W. Rep. 516. On the other hand, the Supreme Court of Arkansas, after applying the said doctrine in the case of *Rayburn* v. *State,* 63 S. W. Rep. 356, reconsidered and reversed its decision later. 63 S. W. Rep. 359.

The reasonings of the New York, Iowa, Texas and Missouri courts are convincing, and as our Penal Code is similar to those in force in these States, their reasonings should be applied in deciding the question which has arisen in this case.

Let us examine the evidence. Returning to his home one night at about 2 or 3 a. m., Julián Valentín found his wife, María Santiago, lying dead on the floor and the child Ramón Mercado who lived with them, in bed covered with blood and also dead. Valentín went to get assistance and returned with his neighbor Simón Villar. The latter advised him not to touch anything but to notify the authorities. They did so. First the police and then the district attorney arrived and this case was initiated. The physician who held the autopsy on Ramón Mercado said that "he was a dark complexioned child about seven or eight years old and of weak constitution * * *; that he had two contusions on the face * * * and a profuse hemorrhage in the exterior part; that after making the autopsy he found that the malar bone was completely destroyed; that it was fractured; that there was a large number of splinters of bone entirely separated adhering to the white tissues; that further in he found that the maxillary bone was destroyed; that the temporal bone was fractured also and the zygomatic base of the temporal bone was also fractured and detached; that still deeper he found a long fracture all along the base of the skull, including the whole length of the sphenoid, and at the termination of the latter a large mass of coagulated blood."

Who caused the death of Ramón Mercado? The evidence on this point is purely circumstantial.

Julián Valentín lived on the outskirts of Mayagüez at a place known as Colombia. He was engaged in the business of hauling freight in wagons drawn by horses. Rufino Izquierdo had been working with him some few days prior to the occurrence, which took place on a Saturday night. At the close of that day Julián and Rufino returned to the home

of the former. Julián Valentín testified in substance at the trial that when in company with Izquierdo he arrived at his home, where his wife and the child were living, he told the former to give Rufino something to eat; that he then took a bath and dressed and his wife served him dinner and combed his hair; that he then left the house with Izquierdo and they went together to the store of Esmoris for the purpose of arranging the weekly accounts; that he offered Rufino a dollar, but the latter took only a quarter and his notebook for the purpose of settling his account later, and that they then separated. Valentín went to the theater and later played lottery, and when he returned to his home he was confronted with the scene which we have described. We already know what he then did. While in the house with his neighbor Villar he observed that a "revolver, some bracelets, rings and a small watch" were missing, which articles were found on the next day near the house of Rufino Izquierdo wrapped in an undershirt belonging to him. This circumstance connected Izquierdo with the crime and he was immediately made the object of investigation.

Izquierdo first testified before the district attorney and later at the trial in his own behalf. He said, in substance, that he was working with Julián Valentín and went to the house of the latter, as customary, to leave the horses used with the wagons; that the woman and the child were in the house; that after serving dinner the woman combed Valentín's hair and as she pulled hard a dispute arose which was continued regarding the sale of some pigs; that Valentín struck his wife with his fist and she fell to the floor; that the child screamed, crying for its mother, and thereupon Valentín gave it a blow with a stick; that Valentín then asked him not to betray him and to that end gave him the jewelry to throw away or do what he liked with it, so that the authorities might think that a robbery had been committed; that he agreed to this and they left together and went to the store of Esmoris to settle the accounts. He accom-

panied Valentín to the theater and then went to get some sleep, going to bed at about 10.30.

Izquierdo's testimony was contradicted by the rest of the evidence as follows: By Julián Valentín, whose testimony we have reviewed; by Francisca Toro, a seamstress who was at the house of Julián Valentín on the night of the occurrence shortly after Valentín and Rufino had left, finding the woman and child alive and well, and she received from the former a certain sum of money; by Pedro Mangual, Anastacio Guzmán and Anastacio Soler, who, at about 10 or 10.30 p. m. saw Izquierdo on the road to a place whence he could go to the Colombia ward, a fact which Izquierdo denied in his testimony; by Dionisio García, who, between 9.30 and 10, saw Rufino going in the direction of Colombia, a fact which Izquierdo also denied in his testimony; by Pascual Soto, who testified that Rufino did not sleep at his house on the night of the occurrence, and by Nicasio Oliviery, who saw him drinking coffee in a hut about 5.30 a. m. on the Sunday following the night on which the crime was committed. The sleeve of the coat of the defendant was found to be stained with human blood.

Such, briefly, was the evidence examined. The jurors deemed it sufficient. They believed Julián Valentín and decided that Izquierdo's story was untrue. The violent death of the child was fully proved by direct evidence and the guilt of the accused by circumstantial evidence. The bloodstains and, above all, the jewelry stolen from Valentín's house constitute strong incriminating evidence against Izquierdo. His testimony before the jury takes up nine pages of the transcript, and if his vacillation, his contradictions and the unlikelihood of his story can be observed by merely reading his testimony, it is not strange that the jury who heard it from his own lips should cast it aside as unworthy of credence. On the other hand, the testimony of Valentín is logical and was corroborated by all the rest of the evidence with the exception of the defendant's testimony. The mur-

dered child lived with Valentín and his wife for several years.
When Valentín married María Santiago he had nothing, but
by their joint efforts he prospered and finally became the
owner of three small houses. She was an industrious woman
and, according to his neighbor Villar, lived happily with her
husband.

In these circumstances the verdict of the jury should not
and cannot be disturbed. The judgment appealed from is

*Affirmed.*

Chief Justice Hernández and Justices Wolf, Aldrey and
Hutchison concurred.