■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JUAN MARRERO, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered January 19, 1977, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence. Judgment modified, on the law and the facts, by reducing the conviction of murder in the second degree to one of manslaughter in the first degree, and by reversing the sentence imposed thereon. As so modified, judgment affirmed and case remanded to Criminal Term for resentence. The thrust of the People's case rested on defendant's confession that, in the midst of a dispute with his wife, he lost control of himself and strangled her. Defendant contends that the People failed to prove beyond a reasonable doubt the intent necessary for a conviction of murder in the second degree (see Penal Law, § 125.25). We agree. The language of defendant's confession does not, by itself, prove the element of intent to cause death. Moreover, intent to cause death may not be inferred from the mere fact of killing (see *People v Patterson,* 39 NY2d 288, 302). However, the evidence does establish defendant's guilt of manslaughter in the first degree and we have modified the judgment accordingly (cf. *People v Guarino,* 56 AD2d 638). We have examined defendant's other contentions and find them to be without merit. Gulotta, Cohalan and Martuscello JJ., concur.

Margett, J., dissents and votes to affirm the judgment, with the following memorandum, in which O'Connor, J. P., concurs: Defendant was found guilty by a jury of the strangulation murder of his wife. On appeal he contends, and the majority agrees, that the People failed to prove an intent to cause her death. Nevertheless, the majority has held that the evidence does establish that defendant is guilty of manslaughter in the first degree. In so doing, they have necessarily found that defendant intended to cause "serious physical injury" (Penal Law, § 125.20). On the facts of this case it is untenable to hold that a jury could infer an intent to cause serious physical injury by strangulation, but not death, and I would affirm the judgment. The decedent's cousin, Margaret Ricks, testified that the defendant married

the decedent, a woman nearly twice his age,[1] early in the year 1975. It appears that the decedent owned a house in Queens, property on Long Island, and had certain other assets.[2] In June, 1975 the decedent's cousin tried to locate the decedent without success. The cousin then went to defendant's place of employment where she spoke to him. When asked where the decedent was, he told Ms. Ricks that they had engaged in an argument and that he thought the decedent had gone to New Jersey. Ms. Ricks told defendant that she would like to "go into the house" and defendant agreed to meet her there when he finished work. He never appeared and, after waiting for an hour, Ms. Ricks reported her cousin "missing" to the police. The defendant was subsequently contacted by the police. When interviewed by Detective Labrador, he showed the detective a note that had allegedly been left on the door by his wife. The note, which was signed "Kathryn Reed Marrero", stated that the decedent had gone to Mexico and would be away for "five months or more." It further stated: "My husband take care business for me." After receiving this note, Detective Labrador requested, and was given, written permission by the defendant to search the house. The resulting search revealed nothing as to the whereabouts of the decedent. However, Detective Labrador did notice a similarity between the defendant's written consent to the search and the handwriting on the note supposedly left by the decedent. Several days later, on June 18, 1975, Detective Labrador returned to defendant's home and confronted him with this observation. Defendant admitted that he had, in fact, written the note "so it would answer some questions made by the family and friends, [and] neighbors, of Mrs. Marrero." Detective Labrador asked defendant if he would come to the precinct the next day "for a formal interview" and the defendant agreed. At that interview, on June 19, 1975, defendant admitted that his wife was in the house. He returned there, accompanied by a number of police officers, and, when asked where his wife was, he led the police to the basement and pointed to a window in the foundation wall which was covered with tar paper. On the other side of this wall was a crawl space beneath an extension to the house. A body was recovered four and one-half to five feet beneath the dirt floor of that crawl space. Defendant told Detective Frank Moore that on May 31 his wife had been nagging him; that he had left the house and then returned with two bottles of rum; and that he and his wife had a drink, after which she started nagging him again. Defendant told Moore he had gone into the basement and was followed by his wife, who was still nagging. Defendant said he walked back upstairs but was followed by his wife. He went back down into the basement and was still followed by his wife. At this point she allegedly threw a hammer at him which struck him. Defendant told Moore that he then grabbed her by the throat with his left hand and strangled her. The doctor who performed an autopsy on the body testified that it was his opinion that the cause of death was manual strangulation. Although the body was badly decomposed, he was able to ascertain that one of the extensions of the hyoid bone, a horseshoe-shaped bone just above the voicebox, had been "broken away". Furthermore, he noted a staining in one area of the neck muscle which, in his opinion, was blood. There was no

---

1. The decedent's age was listed as 57 in the missing person report. At the time of the homicide, defendant was 31 years of age.

2. This was adverted to in the transcript of a tape recording of a conversation between the defendant and Detective Labrador. The transcript was introduced in evidence at the trial.

evidence of disease. Dr. William Benenson, a former New York City assistant medical examiner, was called by the defense and testified that upon examination of the autopsy report he could not come to any conclusion as to the cause of death. He noted, with respect to the hyoid bone, that the autopsy report stated that the ends of the bone in the area of the "separated" portion of bone were "rounded". This "rounding" (as opposed to an irregular crack) suggested to him that the "condition" had existed well before the death of the person and that the "separation" could have been congenital. Dr. Benenson was not questioned about the "staining" in the neck muscle. He could not exclude manual strangulation as the cause of death.[3] On this evidence the elements of murder in the second degree and manslaughter in the first degree were charged to the jury. The verdict was guilty of murder in the second degree. I would not override the jury's findings. A number of fundamental legal principles militate against a reversal in this case. Upon this appeal we must, of course, accept a view of the facts most favorable to the People's case (see *People v Monaco,* 14 NY2d 43; *People v Santiago,* 62 AD2d 572). Intent is a mental state peculiarly within the knowledge of the actor, and must ordinarily be proven on the basis of inferences drawn from the totality of the circumstances *(People v Horton,* 18 NY2d 355). In a classic statement of the law, the Court of Appeals addressed this problem of proof in an 1884 decision *(People v Conroy,* 97 NY 62, 77-78): "Whenever intent is made an element in determining the character of an act, it is in accordance with our general observation and experience to infer its existence, by reference to the laws which have been usually and generally found to control human conduct. Indeed, this is the only method by which the intent can be made to appear. The intent formed, is the secret and silent operation of the mind, and its only visible physical manifestation is in the accomplishment of the thing determined upon. The individual whose intent is sought to be ascertained may remain silent, or if he speaks may, and probably will if he has a crime to conceal, speak untruly, and thus the mind is compelled from necessity to revert to the actual physical manifestations of the intent, exhibited by the result produced, as the safest if not the only proof of the fact to be ascertained." In seeking the truth with regard to the actor's intent in a homicide case, the trier of fact must consider all of the circumstances of the act including, but not limited to, the means used to commit the homicide (3 Warren, Homicide [Perm ed], § 272) and the conduct of the actor subsequent to the homicide. "Evil intentions" might be presumed where the accused "adopt[s] a line of conduct intended to convey false impressions as to the circumstances of the crime" *(People v Conroy, supra,* p 80; *People v Ruberto,* 10 NY2d 428). The trier of fact may also be guided by the ancient rule that "a person intends that which is the natural and necessary consequence of an act done by him" *(People v Conroy, supra,* p 77; see, also, *People v Agron,* 10 NY2d 130, 139). Finally, the issue of intent to cause death is ordinarily a question of fact for the jury (or other trier of fact) (see *People v Ferraro,* 293 NY 51). Where there are conflicting inferences to be drawn from the proof, the choice of inferences is for the trier of the facts, and that choice is to be

---

**3.** Dr. Benenson's testimony about the hyoid bone is significant because it would indicate that the victim's death was not a sudden occurrence, coming within seconds of the cleavage of a portion of bone. He testified that strangulation ordinarily results in death from asphyxiation. One might conclude, if defendant's admission about strangling his wife is believed, that it took some time for the victim to expire. This would certainly have a bearing on the question of defendant's intent to cause death.

honored unless unsupported as a matter of law *(People v Pooler,* 41 AD2d 1011, affd 34 NY2d 772). At bar, the jury could have inferred an intent to cause death from the manner in which the homicide was committed. Defendant admitted strangling his wife and his story as to the manner in which death was caused was corroborated by the testimony of the doctor who examined the body. My research has failed to disclose any case involving a homicide committed by means of strangulation where the question of intent to cause death was kept from the jury (see *State v Sturdivan,* 497 SW2d 139 [Mo]; *Breeding v State,* 220 Md 193; *People v Maringer,* 101 Cal App 2d 586; *Downey v People,* 121 Col 307; *Moss v State,* 32 Ala App 250; *Gipson v State,* 147 Tex Cr Rep 428). Yet that is exactly the thrust of the majority's holding. The jury might also have considered defendant's rather elaborate efforts to conceal the fact of his wife's death. The body was so well hidden that a prior search of the premises—including "an extensive search of the basement"—by a detective, failed to disclose any hint as to the whereabouts of the decedent. When the decedent's absence was first detected by her cousin, defendant initially concocted a story about how he thought his wife had gone to New Jersey. By the time the police contacted him, defendant had contrived a feigned note from his wife, explaining that she had gone to Mexico and directing that her husband take care of her business affairs. While it is entirely possible that the defendant acted as he did out of fear (cf. *People v Leyra,* 1 NY2d 199, 209), the jury could properly have inferred otherwise and concluded that defendant's actions were inconsistent with those of a man who had killed his wife in the heat of passion. It should be noted that, in any event, there was no defense of "extreme emotional disturbance" (Penal Law, § 125.20, subd 2). Although defendant's admission contained suggestions that there may have been elements of "extreme emotional disturbance" in this case, the jury was entitled to sift the various portions of that admission and cull therefrom a conclusion which discredited defendant's version of the surrounding circumstances, but which credited his statement that he strangled his wife (see *Gangi v Fradus,* 227 NY 452, 457). Indeed, the majority's reduction of the conviction to manslaughter in the first degree is based solely upon their belief that while intent to cause death was not proven beyond a reasonable doubt (cf. Penal Law, §§ 125.25, 125.20, subd 2), the proof did establish an intent to cause serious physical injury (see Penal Law, § 125.20, subd 1).[4] Furthermore, neither premeditation (see Hechtman, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law, § 125.25, pp 398-399), nor motive[5] was a necessary element of the People's case. To convict, the

---

4. By reducing defendant's conviction to one of manslaughter in the first degree, the majority must necessarily hold that either (a) defendant intended to cause "serious physical injury" (Penal Law, § 125.20, subd 1), or (b) that defendant intended to cause the death of his wife, but that he did so while acting under extreme emotional disturbance (Penal Law, § 125.20, subd 2). Since the majority has held that the People failed to prove intent to cause death beyond a reasonable doubt, they have necessarily found that defendant "merely" intended to cause "serious physical injury" (Penal Law, § 125.20, subd 1).

5. Although no motive for the homicide was established by the prosecution, there were facts in evidence which suggested that this homicide may have been the result of something other than a marital squabble. The age difference between the spouses was, to say the least, rather unusual. They had been married less than six months at the time the homicide occurred. There was an allusion, in the transcript of the

jury need only have found that defendant caused his wife's death and that he intended to do so. By substituting its own judgment as to the inferences to be drawn from these facts, the majority has effectively overlooked a number of fundamental principles of law.

---

interview between Detective Labrador and the defendant, to property owned by the decedent. Defendant had the presence of mind, when he created the bogus note from his wife, to direct that he would take care of her "business". While not technically germane to the issue before this court, it is interesting to note that at sentencing, the Judge who presided at the trial expressed his opinion that "this was a premeditated vicious murder".