■ The People of the State of New York, Respondent, v Napoleon James, Appellant.—Judgment, Supreme Court, Bronx County (Ivan Warner, J.), rendered January 10, 1986, which convicted defendant, after a jury trial, of murder in the second degree and sentenced him to an indeterminate term of imprisonment of from 25 years to life, unanimously reversed, on the law, and the matter is remanded for a new trial.

The defendant was convicted after a jury trial of murder in the second degree, and sentenced to an indeterminate term of

imprisonment of from 25 years to life. The evidence was clearly sufficient to support the jury's verdict. The single important question presented on this appeal is whether the trial court erred in denying defendant's request to submit manslaughter in the first degree as a lesser included crime. In our opinion, there was a reasonable view of the evidence supporting defendant's request for the submission of manslaughter in the first degree, and the failure to grant that request accordingly was error, requiring that the judgment be vacated and the case remanded for a new trial.

On November 2, 1984, starting at about 8:00 P.M. and lasting until 10:00 P.M., Mr. D'Andrea London, defendant's downstairs neighbor at 124 Featherbed Lane in The Bronx, heard noise coming from defendant's apartment. He described the noise variously as "a lot of bumping", and as though "somebody was stomping on the floor." At about 10:00 P.M. Mr. London went upstairs, knocked on the defendant's door, and asked the defendant if he could stop the noise. The defendant said "he was having problems and now he was going to have to kill somebody." Mr. London advised him not to do it because he would get in trouble. Defendant said something about an unnamed person owing him some money. At one point Mr. London entered the living room of the apartment and saw in another room the bottom part of a person lying on a bed. The defendant showed him a puddle of blood under a paper bag in the living room. Mr. London left, explaining that he did not believe that the defendant in fact intended to kill anybody, and that he himself on occasion had uttered some such comment.

At about 11:15 that evening, Ms. Tonia Gee, who lived in a bedroom in defendant's apartment, arrived home with her boyfriend, Fletcher Reaves. Although the accounts of the two differ in minor detail, it appears in substance from their testimony that the defendant was pacing around the apartment, saying that he was in serious trouble. After a while he spoke to Ms. Gee, telling her that he had killed the deceased, James Willie Jones. Some time later at about 12:30 A.M., the defendant, after asking if they wanted to see the body, dragged Mr. Jones' body out from his bedroom into the middle of the floor where it lay face down. The defendant said that death had occurred at about 10:00 P.M. He then began kicking the body in the head, saying "You stupid bastard, you could have been here now", and continued to kick the body, stopping only after two others who also lived in the apartment knocked on the front door. Before answering the door, the

defendant dragged the body back into the bedroom and then told the two other roommates that they could not stay in the apartment that evening. Fletcher Reaves left the apartment while the defendant was talking with the two other roommates, and shortly thereafter was followed by Ms. Gee.

At about 2:30 A.M., the defendant woke up Philip Tucker, who had previously shared an apartment with him, by knocking on the window of his ground-floor room. Defendant told Mr. Tucker that "He thought he had killed somebody" and wanted Mr. Tucker to come and look. Eventually, Mr. Tucker walked with the defendant to the apartment, observing that the defendant appeared to be drunk and was slurring his speech slightly, but was not so drunk that he could not walk or think properly. At the apartment, the defendant asked Tucker to ascertain if the deceased was actually dead, and Mr. Tucker concluded that he was. Thereafter, the defendant dragged the body out of the bedroom and over to the living room window, where he dropped the body onto the roof of the adjacent building. The defendant then dragged the body across the roof and dumped it into an alleyway.

The defendant told Tucker and Ms. Gee, who had returned to the apartment, to keep quiet, and further threatened a couple in one of the other bedrooms not to leave the bedroom or he would kill them. Mr. Tucker left the apartment and walked back to his own apartment accompanied by Ms. Gee and the defendant, who was carrying a bloody sheet removed from the bedroom where the body had been. The defendant and Ms. Gee dumped the sheet by a nearby housing project.

That afternoon, Saturday, November 3, Mr. Tucker called the police to tell them where the body was located, and the body was eventually found at about 5:00 P.M. Later that day the defendant told another person that he had killed the deceased.

An assistant medical examiner testified to the results of an autopsy performed on the deceased. Excluding extensive force injuries that may reasonably be attributable to the body's fall to the alleyway, it appears that death was caused by strangulation by hand, and that the body also exhibited two puncture wounds, one to the upper right arm and the other to the left leg below the knee. The medical examiner described the puncture wounds as fairly superficial and not typical of those made by a knife.

Testifying in his own behalf, the defendant denied killing the deceased or telling anyone that he had done so.

In support of his request to the court to submit the lesser included offense of manslaughter in the first degree, defense counsel asserted that the defendant's intoxication gave rise to an issue with regard to his intent. Although the reason assigned for the request is unpersuasive, we are satisfied that the defendant's request to the court was adequate under all the circumstances to preserve the issue for review as a matter of law.

The principle is of course clear that a trial court is required to submit upon the request of either party a lesser included offense if there is a reasonable view of the evidence that would justify the jury in convicting the defendant of the requested lesser offense, and not of the offense charged. (CPL 300.50 [1], [2].)

Where the issue presented is whether a defendant charged with murder intended to kill the deceased, the principle is long and well established that the question is for the jury, except in most unusual and exceptional circumstances. The reason for this principle was set forth with compelling force in 1927 by Chief Judge Cardozo in *People v Moran* (246 NY 100, 103), a case in which the defendant had fired three shots at close range, killing two police officers who had stopped a vehicle in which the defendant was a passenger: "Whenever intent becomes material, its quality or persistence—the deranging influence of fear or sudden impulse or feebleness of mind or will—is matter for the jury if such emotions or disabilities can conceivably have affected the thought or purpose of the actor."

The principle was squarely reaffirmed by the Court of Appeals only a few years ago in *People v Butler* (57 NY2d 664, 666, *revg* 86 AD2d 811), a case in which the deceased died of a gunshot wound to the head. Still more recently, the principle was reaffirmed by this court in *People v Logan* (120 AD2d 359), a case in which the deceased died as a result of a gunshot wound, caused by one of seven shots fired by the defendant, several of them apparently having been fired while the deceased was on the ground. The strength of the principle is underlined by the candid acknowledgment of the District Attorney that he was unable to find a single reported decision in the appellate jurisprudence of this State that sustained a conviction for murder arising out of a charge of intentional killing in which the trial court had declined a defense counsel's request to submit manslaughter in the first degree as a lesser included offense.

Reserving for separate discussion the significance of defen-

dant's statement that "he was going to have to kill somebody", it is apparent that there is nothing about a homicide caused by manual strangulation that makes it an exception to the long-established and consistently followed rule, or attributes to a death so caused a compelling inference of intent to kill that is absent from cases in which death was caused by shooting or by knife wounds. On the contrary, it is self-evident that in the course of an altercation a defendant may unintentionally cause the death of another by choking that person in an effort to subdue him. Indeed, in *People v Marrero* (67 AD2d 951), the court found the evidence insufficient to establish the defendant's guilt of murder beyond a reasonable doubt where death was caused by manual strangulation, and did so over the strenuous objection of the dissenting Judge that the issue was classically one for the jury.

Turning to the defendant's statement that he was going to have to kill somebody, it is immediately apparent that the evidence does not exclude as a reasonable possibility that the deceased was already dead at the time the defendant made the statement. The witness testified to observing the lower part of a person lying on a bed. He did not testify to any movement on the part of the person he saw or anything that would compel the conclusion that the person was still living. No doubt it might be inferred from the defendant's statement that he believed the deceased was still living at the time he made it, but that opinion is hardly conclusive.

If the deceased was in fact dead at the time the defendant made the statement, which is at least a reasonable possibility and may be thought to be as consistent with the evidence as the alternative hypothesis, his comment would be wholly insufficient to exclude the reasonable possibility that death had not been caused intentionally. Indeed, if the deceased were already dead at the time of the comment, the defendant's statement could reasonably be construed as indicating that he did not believe at the time he made it that he had killed the deceased, and therefore would be inconsistent with the hypothesis of an intentional killing.

In view of this central reality, it is unnecessary to consider whether or not the refusal of the requested charge would have been justified if the evidence conclusively established that the deceased was living at the time the defendant made the statement. As to that contingency, it may be appropriate to observe that it is not uncommon in the course of disputes or altercations for persons to make threats that do not in fact embody their true intent. It may be asserted with confidence

that there have been many cases in which a person was killed in the course of an altercation after the defendant made such a threat, in which juries concluded, and concluded quite reasonably, that the defendant did not intend to kill the deceased.

No doubt a stronger case for denial of the requested instruction would have been presented if the evidence incontrovertibly established that the deceased was alive but helpless at the time the threat was made, and that the defendant thereafter strangled him. The evidence here does not incontrovertibly establish that factual situation and, accordingly, it is unnecessary to consider what would have been an appropriate judicial response in such circumstances. Concur—Murphy, P. J., Sandler, Carro, Milonas and Wallach, JJ.