THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. WILLIAM H. REYNOLDS and Another, Appellants.

Second Department, June 26, 1925.

Crimes — grand larceny, first degree — defendants at time of alleged crime were respectively mayor and treasurer of city of Long Beach — indictment charges larceny of public funds — special assessment bonds were issued to cover grading and paving of streets on which defendants owned lots — bonds were apparently sold at par to contractors,— later bonds were sold through defendants' efforts at private sale to bond house at ninety-six and contractors gave city check for four per cent of par, representing difference and received in exchange check of city for like amount — check given by city to contractors in exchange constitutes alleged larceny — defendants contend that bid by contractors was fictitious and was deliberately offered at request of defendants to enhance credit of city — bonds were never in possession of contractors — no one profited by transaction — exchange of checks was alleged to have been made for bookkeeping purposes merely — if sale to contractors was fictitious, larceny was not committed — fact that defendants owned ·property on said streets not motive — instructions — error to charge, as matter of law, that contractors' purchase was binding — question of validity of sale was for jury — question for jury whether defendants intended fictitious sale to save credit of city — error to charge, as matter of law, that check given by city to contractors represented money of city and was unlawfully paid — even though sale to contractors was valid, crime was not committed if checks were exchanged to save credit of city — error to charge in effect that payment to contractors in violation of Charter of City of Long Beach, § 253, relating to audit constituted larceny — submission of question of felonious intent did not overcome erroneous charge that larceny was committed if defendants knew it was wrong to exchange checks.

The defendants were erroneously convicted of the crime of grand larceny, under an indictment charging them with stealing the funds of the city of Long Beach at a time when the defendants were respectively the mayor and treasurer of said city, on evidence which shows that the city of Long Beach issued certain special assessment bonds to cover the cost of grading and paving certain streets on which the defendants owned some property; that certain contractors bid par for said bonds and the same were awarded to them; that thereafter the bonds were sold through the efforts of the defendants at private sale to a bond house at ninety-six per cent of par; that the contractors who bid par for the bonds never had the bonds in their possession and after the private sale the contractors gave a check to the city for four per cent of the par thereof, which is the difference between the price paid by the bond house and par, and received in exchange for that check a check from the city for a like amount; that the transfer of the city's check to the contractors constitutes the basis of the crime of grand larceny; that the defendants contended and offered substantial evidence to prove that the contractors submitted their bid at par, at the solicitation of the ·defendants, for the express purpose of saving the credit of the city, inasmuch as it was thought that the bonds would not sell at par on the open market, and

that the arrangement between the contractors and the defendants and the common council never contemplated an actual sale of the bonds to the contractors on their bid at par.

If, as contended by the defendants, the alleged sale to the contractors was fictitious and the bid by the contractors was put in solely for the purpose of saving the credit of the city so that it would appear that the city's bonds could be sold at par, and there was never any intention on the part of the contractors or the defendants that the alleged sale to the contractors should be binding, then the transaction, claimed to have been made solely for bookkeeping purposes, whereby the city gave the contractors its check and received in return a check from the contractors, did not constitute larceny.

The fact that the defendants owned property on the street to be improved furnishes no motive for the alleged larceny, for the bonds issued against the security of that and other property on the street would eventually have to be paid at par, so that the defendants could gain nothing by the alleged fictitious transaction.

It was error for the court to charge, as a matter of law, that the contractors were under a legal obligation to take and pay for the bonds at par, but the question whether or not the alleged sale to the contractors was valid and binding and not fictitious should have been submitted to the jury as one of the elements of the crime charged, and furthermore, the question should have been submitted to the jury whether or not it was the defendants' purpose to have it appear, in order to save the credit of the city, that the bonds were sold at par, and whether the sale to the bond house was the first real genuine sale of the bonds.

It was improper for the trial justice to hold that it was a question of law for him to decide whether or not the sale to the contractors was fictitious upon the theory that there was no dispute in the evidence, for so long as different inferences could be drawn from the evidence, there was a question of fact for the jury to pass on.

It was error also for the court to charge, as a matter of law, that the check given by the city to the contractors in exchange for the contractors' check was money of the city and was unlawfully paid by the defendants to the contractors, for the evidence is such as to permit a legitimate inference that there was not an actual payment when the check was delivered, but that the check was delivered in pursuance of the arrangement between the contractors and the defendants, and as a matter of bookkeeping only in completing the alleged fictitious sale; it was for the jury to say whether by that transaction the city's money was unlawfully paid out.

Furthermore, even though it were to be held that the sale to the contractors was valid, and that they could be held in civil action thereon, and that the payment made to the contractors was illegally made, no crime was committed if the defendants made the payment for the purpose of maintaining the credit of the city and as a mere exchange of checks and in recognition of a moral obligation on the part of the city to reimburse the contractors under the arrangement made between the defendants and the contractors, so long as there was no criminal intention on the part of the defendants to deprive the city of any of its property.

It was error for the court to charge that larceny was committed by the defendants if, when they gave the contractors the check, they knew it was wrong to do so, for that, in effect, was a charge that the payment if it was made in violation of section 253 of the Charter of the City of Long Beach, which was read into the record by the prosecution, and which provides for the auditing of claims before payment, constituted the crime of grand larceny, for the charge, as given, practically told the jury that the defendants could be convicted of larceny

independent of any theft simply because of a failure to comply with the charter provision.

The submission to the jury at the request of the defendants of the question of a felonious intent did not overcome the misleading charge that if the defendants knew that it was wrong to exchange the checks they were guilty of the crime of grand larceny in the first degree.

It must be observed also, in connection with this case, in which the guilt of the defendants is extremely doubtful, that the defendants did not appropriate to their own use a single dollar of the city's money, and that the contractors, who it is alleged received the city's check, did not profit thereby, since they gave their own check in return.

MANNING, J., dissents in part; KELLY, P. J., dissents, with opinion.

APPEAL by the defendants, William H. Reynolds and another, from a judgment of an Extraordinary Trial Term of the Supreme Court, rendered on the 5th day of July, 1924, convicting them of the crimes of grand larceny in the first degree, misappropriation of funds by a public officer, and wrongfully converting and paying out money owned by and the property of the city of Long Beach.

*Abel E. Blackmar [Henry A. Uterhart* and *Peter P. Smith* with him on the brief], for the appellants.

*Kenneth M. Spence, Deputy Attorney-General [Albert Ottinger, Attorney-General,* and *Robert S. Johnstone, Deputy Attorney-General,* with him on the brief], for the respondent.

KAPPER, J.:

The defendant Reynolds was the mayor and the defendant Gracy was city treasurer of the city of Long Beach, incorporated as a city by chapter 635 of the Laws of 1922, which became a law on April 13, 1922, and is known as the Charter of the City of Long Beach. Reynolds was the first mayor of the newly-made city, which, prior thereto, had been a village, and of which Reynolds had been the village president and Gracy a trustee.

In the spring of 1922 Reynolds employed a real estate auctioneer to conduct an auction sale of land in Long Beach, the sale not only to include the lots of numerous private owners, but also lots owned by corporations in which Reynolds had substantial interests as a stockholder. This auction sale was held at Long Beach in the early part of July, 1922, and realized a comparatively large amount of money. Amongst the lots sold were some personally owned by the defendant Gracy, and they, too, realized a substantial sum.

An indictment in four counts (the second count of which was withdrawn upon the trial from the jury's consideration) was found against the defendants. The first count charged them with the commission of the crime of grand larceny in the first degree on December 2, 1922, in the stealing of $2,440, the property

of the city of Long Beach. The third count charged the " Crime of Misappropriation by public officer," in the receipt by Gracy, for and on account of the city of Long Beach, of the sum of $2,440 and the felonious appropriation of the same to his own use and to the use of Michael J. Dollard and Samuel R. Rosoff, and the aiding and abetting of Gracy in such acts by Reynolds. The fourth count charged the crime of a wrongful conversion and paying out of money owned by and being the property of the said city in that the said sum of $2,440 was received by Gracy as treasurer of the city, and that he feloniously and wrongfully converted the same by paying it to said Dollard & Rosoff who were alleged not to be entitled to receive it, and that in that transaction Reynolds was concerned in aiding, abetting and assisting Gracy. The last two counts in the indictment were based upon sections 1864 and 1865 of the Penal Law. Those sections make a public officer guilty of a felony who appropriates either to the use of himself or to the use of any other person not entitled thereto and without authority of law, any city moneys, and who willfully and wrongfully pays out city moneys.

It is of no consequence now to enter upon a consideration of the third and fourth counts, as the learned trial justice charged the larceny accusation as being the only crime for which the defendants were being tried and on which a conviction might be had, this charge being tantamount to a determination that a conviction may not be had on the other two counts.

Recurring to the history of the case, we find that in the spring of 1922 Reynolds negotiated with Dollard & Rosoff to do the work of grading and paving various streets in front of or in the vicinity of the property which it was proposed to auction, and induced them to commence work before a formal contract was made. The work was started by them in the month of May, 1922. On the twenty-seventh of June following, resolutions were adopted by the city council of the city of Long Beach for such grading and paving and for some sewer work, the same to be done at the expense of the property owners; and on the same day the contract based upon the resolution was signed and approved on the part of the city, Dollard & Rosoff executing it on the seventeenth day of August thereafter. Prior to the incorporation of the city the owners of the property which it was sought to benefit by the paving work petitioned the board of trustees of the then village of Long Beach to have the work done, such improvements " to be wholly at the expense of the owners of the adjoining land."

At the meeting of the city council held on said June twenty-

seventh it was resolved that the payments to be made under the contract for the doing of the work " shall be made out of moneys derived from assessments for the local improvements therein provided for and not out of general funds of the city or that said payments be made from the proceeds of bonds or notes issued in anticipation of the collection of such assessments; " and the contract between the city and Dollard & Rosoff contained the same provision.

On August 1, 1922, resolutions apportioning the assessments for said improvements were adopted; and on August eighteenth thereafter the city council authorized a total issuance of these special assessment bonds to the amount of $484,000, with a direction that the bonds be sold " at the regular monthly meeting of the Council Sept. 5, 1922." The notice of sale stated: " The principal and interest of these bonds are payable solely from assessments levied and collected by the city upon the various lots or parcels of land benefited." On September 5, 1922, the sale was duly adjourned to be held at the same place on September 15, 1922.

On September 15, 1922, while the paving work was in progress, Reynolds asked Dollard to bid on these special assessment bonds, stating, in effect, that he, Reynolds, wanted the bonds sold at par for the benefit of the city's credit, adding that the bid was only a matter of form and that a check for five per cent of the amount of the bonds, aggregating $24,200, to be drawn by Dollard, would be given back to him immediately. Dollard was illiterate, unable to read or write, excepting the signing of his own name, and a bidding sheet which was brought to him by Reynolds was subsequently signed by Dollard and then brought by the latter together with a check for $24,200 to the meeting, handed in, and thereupon the defendant Gracy immediately handed back the same check to Dollard. It is not claimed that any bonds ever were delivered to Dollard. Rosoff, who was not present at that time, later spoke to Reynolds about it, asking Reynolds what the transaction was all about. On this point Rosoff testified: " Q. What did you say to Reynolds? A. I asked him, I said my partner told me that he bid in on some bonds here, what is it all about, and the Mayor said it was merely a form that he did not want the — they were receiving some bids — now let me get this right — he said they were receiving bids on some bonds, and they did not want any bids below par, and that is why he got my partner to bid on it, and we would not stand any loss, that he would see the bonds were disposed of, and he said either I or we will see there will be no loss to you people."

Rosoff also never saw any bonds.

These witnesses were called by the prosecution. There is no material dispute as to what they testified to and, indeed, there is very little material dispute as to any of the facts. What the defendant Reynolds testified to regarding his purpose in having Dollard & Rosoff bid on these bonds will be referred to later. The theory of the defendants was that all of the parties concerned in the transaction well understood that Dollard & Rosoff's bid was a mere fiction to make it appear that the bonds were sold at par for the purpose of holding out the city with an unimpaired credit, and with a view of permitting the bonds to be sold thereafter at private sale. There were bids on September fifteenth, besides the so-called bid of Dollard & Rosoff, from two other sources, both of them being conditional, the one conditioned upon whether or not these special assessment bonds were a legal investment for the savings banks of the State of New York, and the other being for $94 for each $100 par value of the bonds, also conditioned upon an " approved legal opinion " regarding their legality.

The reason for all this appears to have been that there was a grave doubt in the minds of the defendants whether these special assessment bonds constituted a legal obligation of the city, their issue being protected solely by a collection of the assessments and an application of such collection toward the payment of the bonds. This was said to be a new form of obligation in the State of New York, but the question is not now of importance in view of the disposition that should be made of this appeal.

As already stated, Dollard & Rosoff, under this arrangement with Reynolds, purported to bid par for the whole issue, their bid containing the words that their check for $24,200 was to be returned in the event of the bid not being accepted; the arrangement also, as stated, calling for a return of the check to Dollard which was immediately done. Notwithstanding this, the city council passed a resolution, the defendant Reynolds being present, awarding the bonds to Dollard & Rosoff as the highest bidder.

Following the fifteenth day of September Reynolds visited a number of bond houses in the city of New York, representing that the bonds had been sold to the contractors, Dollard & Rosoff, and made efforts to make a sale of them to those whom he visited. Amongst other bond houses he visited the firm of Watkins & Co., and on the same representation obtained from them an offer of ninety-six for the whole issue, which was the best offer he could obtain. This was testified to by a witness called by the prosecution and in the employ of Watkins & Co. and who further testified that the reason why Watkins & Co. would not pay more for the bonds was on account of the character of the obligation and that

the bonds were worth less in the market then the ordinary municipal obligation. This witness further testified that the bonds were actually sold subsequently by Watkins & Co. at ninety-seven and one-half.

Dollard testified that he went with Gracy to Watkins & Co. where he signed some papers but that he did not then, nor at any other time, see any bonds; although he further said that Gracy told him that " they transferred them " to Watkins & Co. What paper Dollard signed in the office of Watkins & Co. does not appear.

Subsequently, upon the issuance of the bonds, Gracy took them in installments from time to time, and delivered them to Watkins & Co. These deliveries were on different dates beginning October 2, 1922, and the last one on January 2, 1923. Contemporaneously with the delivery of the bonds to Watkins & Co., the latter gave to Gracy checks for ninety-six per cent of the face value of the bonds and accrued interest. They were indorsed to the order of Dollard & Rosoff and by them indorsed to the city of Long Beach, delivered to Gracy and entered on the books of the city as payments on the bonds. These checks never came into the possession of Dollard & Rosoff except for the special purpose of indorsing them.

At the time that these checks were given by Watkins & Co., Gracy drew checks of the city of Long Beach for four per cent of the face value of the bonds, took these checks to the office of Dollard & Rosoff and they were there exchanged for checks of a like amount, signed by Dollard & Rosoff to the order of the city. One of these checks of the city, signed by Gracy to order of Dollard & Rosoff, was dated December 2, 1922, and was for the amount of $2,440. It was for the handing of this check to Dollard & Rosoff in exchange for a check of like amount that the defendants were indicted and convicted.

Snow, a witness for the prosecution, an employee of Dollard & Rosoff at the time of the transaction, testified that Gracy brought him these checks for four per cent of the par value of the bonds, requesting a check in exchange, and that these checks were duly exchanged, and that the transaction was merely an exchange of checks. It is undisputed that this was the method by which the check of December second for $2,440, which was the check in question, was exchanged for a check of Dollard & Rosoff.

Rosoff, called by the prosecution, testified that these checks were exchanged checks; further that upon asking Reynolds about the transaction, the latter informed him that a check would be given back for the same amount, which he was told by Reynolds was a " form of bookkeeping, just simply an exchange of checks,

and he told me to get in touch with Gracy and I called up Gracy, and Gracy said it was merely a form of bookkeeping, that neither one of us would be out anything, we will take their check and we will give them our check." He further testified: " Q. What did Reynolds tell you it was for? A. He said to make up the difference of the 4 points between the sale of the bonds and the 4 points on the loss of the bonds, but we would not be out anything because [as] a matter of bookkeeping those exchanges would be made direct, they would send us a check and we would send them a check back."

Lyons, the city's auditor, testified that the books of the city recorded the sale of the bonds at par but that the exchange checks of Dollard & Rosoff were carried on the books in a " suspense account," which this witness, himself, suggested should be done.

It was clearly the understanding upon the trial, by both court and counsel, that these checks paid by Dollard & Rosoff to the city and by the latter to Dollard & Rosoff, were exchange checks. And there is no claim made by the prosecution that any moneys whatever were given to Dollard & Rosoff, with the exception that the prosecution contends that the $19,360 given to them on the exchanging of the checks should not have been given to them because *under their bid for the bonds at par*, the money belonged to the city and could not be paid back to Dollard & Rosoff. To emphasize the situation, it is undisputed that neither Reynolds nor Gracy received a cent either directly or indirectly from the transaction and that if they were guilty of larceny, they at least realized nothing from it. The transaction undoubtedly was crude and jumbled, but the question remained whether what was done constituted larceny; and this clearly depended upon the basic or primary factor, whether the purported bid of Dollard & Rosoff for the bonds at their par value *was a sale in reality to them*, or whether the first *actual sale* was the one to Watkins & Co. at ninety-six, the *bona fides* of which is not in the slightest manner impugned or questioned by any substantial proof. It is said, however, that the form which the transaction took showed that Reynolds and Gracy, having a personal interest in some of the lots abutting these public improvements, had a motive for the alleged larceny. If the obligation of the city to redeem the bonds at par is met it is difficult to discern this interest of the defendants in the improvement of the property as a motive. It is apparent that their so-called properties must be assessed to meet the maturity of the bonds and no gain to them is, therefore, manifest when the process of assessment calls upon their property to make up the difference between par and the ninety-six received upon the sale

to Watkins & Co. But, be that as it may, we must find larceny, if any there was, from a finding to be made ahead of that, namely, that there was an intended and genuine sale to Dollard & Rosoff of these bonds, for which Dollard & Rosoff *owed* the city $484,000.

A part of the testimony of Reynolds should be here set forth, viz.: " I went to Mr. Dollard and asked him if he would bid on these assessment bonds, and I explained to him that they were a different character of bond from a city bond, that there had never been any sold in this State, they were a western proposition, that I did not want the credit of the city of Long Beach hurt for the reason that the name of the city of Long Beach would be on that bond and the bankers and brokers in Wall street might become confused, that they would not bring par, I was sure of, because they were not a direct obligation on the city's property, only on the property benefited, but for the effect on the other bonds when people would bid on the general obligation bonds, I wanted him to come forward and bid par and that I would see that the city would protect him against any loss. He said, all right, Mr. Mayor. Q. And he did so, and a bid was put in in the manner which has been shown by the records? A. It was. Q. Did you report your action in respect to Dollard to your fellow members of the council? A. I did before the meeting. Q. And before the meeting at which the bid was accepted? A. They knew it was coming in. \* \* \* Q. Before disposing of them at ninety-six, did you make any effort to dispose of them with other houses at higher prices? A. I did, to nearly every bond house in Wall Street that deals in municipal bonds, Gibbons & Co., Sherwood & Merrifield, Union National who had bid ninety-four, I tried to get them to raise their bid; a half a dozen other bond houses, to get the best bid obtainable."

Reynolds further testified that he believed that under his agreement with Dollard & Rosoff, the city was bound in equity and good faith to pay to them the difference between the ninety-six, at which the bonds were sold to Watkins & Co., and the par value which Dollard & Rosoff had bid them in for; that he so informed the city council; that the council agreed with him in that respect; and approved of it.

Comparing Reynolds' claim with the testimony given by Dollard and Rosoff, we find very little or no material difference on the proposition that it was Reynolds' claimed purpose in carrying out the transaction complained of to protect or foster the credit of the city of Long Beach which otherwise might or would be affected by a sale of its bonds below par. And it became important, therefore, upon the trial that a determination should be reached upon

the evidence by the jury of the issue relating to the *genuineness* of the sale to Dollard & Rosoff. If that sale was binding and not a fiction, then it might be that a jury, taking into account all that was proved upon the trial, could say that the defendants were moved by a felonious purpose to defraud the city. If the arrangement testified to by Reynolds was made between Dollard & Rosoff and himself for the purpose that he stated it was, namely, to subserve the credit of the city, and with no intention of obligating Dollard & Rosoff on their bid, then the defendants were not amenable to conviction on the indictment found. This issue was not submitted to the jury, but was disposed of by the court. The learned trial justice charged (italics mine): " The *bonds were awarded to Dollard* — I use Dollard only as a representative of the firm — it was awarded *to the firm*, you understand, the bonds were awarded to Dollard *at par and had Dollard under the obligation of paying par* for these bonds, *he owed the City of Long Beach $484,000 for these bonds*. And then Reynolds and Gracy started out to see whom they could get to take these bonds *off Dollard's hands*, and they got finally Watkins & Company if I remember the name, to take these bonds off Dollard's hands and pay 96 for them. Well, you see, that is four points difference, four points on every one hundred dollars, four dollars on every hundred and so on; that means on the whole issue it amounted to $19,360 difference, that is what Watkins paid for the bonds, the difference between $484,000 and $19,360, Watkins paid that difference, but *the bonds had been sold for $484,000*. The *city had to get the money* so Dollard and his firm put up checks representing the $19,360, he gave those checks to the city, no dispute of this, as I understand at least, and so that made the city get the whole $484,000, the bulk of it from Watkins & Company, and the balance of $19,360 from Dollard. * * * *I say to you as a matter of law that this money that was paid out by these. defendants, including this $2,440 item in question,* meaning the whole $19,360, but this particular item in question anyhow, *was the money of the city of Long Beach, it belonged to the city of Long Beach.* And no official of the city of Long Beach had any right to pay it out unless he paid it out in conformity with the provision of law, unless he followed the provisions of law, and he had no more right to pay it out than you and I had to pay it out — of course, you and I could not pay it out following the provisions of law because we were not in authority, so do not misunderstand, I say if he did not follow the provisions of statutes, no official had any right to pay it out. Of course, if he followed the provisions of statute and paid it out properly and legally, then there is no criticism, that would be perfectly justified, but *I charge*

*you as a matter of law that in this case the payment of this check for $2,440,* which is the basis of this indictment, *was improperly paid, unlawfully paid by these defendants,* they had no right in law to pay it, *it was the money belonging to the city* and *it was not paid out* according to any lawful means, or *for any lawful purpose.*  \*  \*  \* So, gentlemen, *you have the payment of the money* that is the basis of the charge, *you have the law that it was the city's money, and you have the law it was unlawfully paid;* that means that it should not have been paid, but it was paid and then you have of course *left at least* the question of whether these defendants *knew* it should not be paid."

The appellants claim that this charge constitutes legal error, and I am of the opinion that the contention must be sustained. Whether or not the transaction was a sale of the bonds to Dollard & Rosoff at par, for which they owed the city $484,000, was a question of fact dependent upon whether there was an actual sale at par to them or whether it was a fictitious transaction to make it appear for the sake of the city's credit that the bonds were sold at par. It was a question for the jury to say whether it was Dollard & Rosoff's *intention* to enter into and make a contract to buy the bonds at par, so also was there the question of the right of the city officials to hold them to it. It was also for the jury to say whether the defendants' purpose was to have it appear, in order to save the credit of the city, that the bonds were sold at par, and whether the sale to Watkins & Co. was the first real, genuine sale. The learned trial justice, in the course of his charge, said that these questions were to be decided by him as a matter of law upon the theory that there was no dispute in the evidence. But, so long as different inferences could be drawn, there was a question of fact and not of law, for the evidence would have permitted the inference that neither Dollard & Rosoff, Reynolds nor Gracy believed that there was a binding contract obligating Dollard & Rosoff to pay par for these bonds, and hence, no sale to them at all. In declaring to the jury that there was a sale to Dollard & Rosoff at par, the learned trial justice took from the jury a very important question of fact and decided that question as a matter of law.

Moreover, the learned trial justice erred in charging, as a matter of law, that the $19,360, including the item of $2,440 in question, was the money of the city and was unlawfully paid by the defendants to Dollard & Rosoff. The evidence in the case would have permitted a finding that this was not an actual payment to Dollard & Rosoff but was in pursuance of the arrangement not to regard it as a genuine sale, but as matter of bookkeeping

only. The checks were undoubtedly exchanged, and the unlawfulness of the payment would depend entirely upon the primary question of whether or not there had been a sale in fact to Dollard & Rosoff and that the defendants believed there had been such a sale. The inducement held out to Dollard by Reynolds to sign the bid upon the representation that it was a mere form and that he, Dollard, would be taken care of and would not suffer any loss from his bid, upon which representation Dollard acted, presented as a question of fact the proposition of the lawfulness or unlawfulness of the transaction. The charge that the check was paid improperly and unlawfully and not according to any lawful means or for any lawful purpose and that the money was the city's money which could not lawfully be paid, was to withdraw from the jury an issue which should have been decided by them.

In *People* v. *Walker* (198 N. Y. 329, 334, 335) Judge VANN, writing for the court, said: " No matter how conclusive the evidence was in the case before us, and assuming that it was wholly uncontradicted and that the inferences all pointed one way, each of the three fundamental facts was for the jury to pass upon, for if the court could take away one from them it could take away all, and thus direct a verdict, which is never allowed in a criminal case. While in a civil action, when there is no conflict in the evidence and no diverse inferences therefrom are possible within reason, the court may direct a verdict even in a case of the utmost importance, still in a criminal action this is not permitted by the law even in a case of the most trifling importance. When the court, without qualification, refused to charge that it was a question of fact whether the property was at any time in the possession of the defendant, in view of what had already been charged, it, in effect, directed a verdict as to a vital element of the crime. All questions of law, except in a criminal prosecution for libel, are for the court, and all questions of fact for the jury. Both by statute and common law they are ' the exclusive judges of all questions of fact ' and every essential element of a crime presents a question of fact, whether there is any conflict in the evidence or not. (Code Cr. Pro. §§ 419, 420.) When the jury are made the exclusive judges of a question as one of fact, the court is precluded from passing judgment upon it as one of law."

Following *People* v. *Walker* (*supra*), the Court of Appeals (per MILLER, J.) in *People* v. *Marendi* (213 N. Y. 600, 618) say: " I allude to it here because of other instances which have come to our notice, in which trial judges, failing to distinguish between civil and criminal trials, have overlooked the rule that in a criminal case every fact essential to constitute the crime charged though

not disputed must be submitted to the jury." (See, also, *People* v. *Tomlins,* 213 N. Y. 240, 245.)

The prosecution urge that the case of *People* v. *Neff* (191 N. Y. 210) .supports the court's charge. There the defendant, as the county auditor of Erie county, certified to the correctness of a warrant payable to a certain contractor on a contract made with the county, the result being the payment of the warrant by the county treasurer. The question turned upon the language of the contract, as to whether the amount was or was not due. The court construed the contract, charging as a matter of law that the contractor could not under his contract charge for the items in question. It was this interpretation placed upon the contract by the trial court that was upheld. But that is not the case here. It was within the province of the trial court to interpret the statutes applicable or relating to the offense charged, and a written contract would fall within the same category. But this does not go to the extent of authorizing the court in a criminal case to define as unlawful a transaction dependent upon oral testimony and susceptible of different inferences. A construction of evidence susceptible of different interpretations is within the exclusive right of the jury to give, and cannot be determined by the court. (*People* v. *Conroy,* 97 N. Y. 62, 80.)

As to the errors in the charge already pointed out, it is not amiss to quote from the brief of the learned counsel for the People, viz.: " Obviously, the question of defendants' good faith in making the payment was a question of fact for the jury to decide." And also: " On the two questions of law which were involved in the motion to dismiss, (1) whether the money paid was the city's money, and (2) whether the payment was unlawful, the Trial Court had no other choice but to decide them in the prosecution's favor. The trial court rightly decided that the case should be submitted to the jury."

Of course, denying the defendants' motion to dismiss on these two important propositions was quite consistent with the duty to submit those questions of fact to the jury. But, as stated, the charge did not submit those questions to the jury.

The appellants also urge that the learned trial court erred in charging as follows (part of which has already been quoted): " So, gentlemen, you have the payment of the money that is the basis of the charge, you have the law that it was the city's money and you have the law it was unlawfully paid; that means that it should not have been paid, but it was paid and then you have of course left at least the question of whether these defendants knew it should not

be paid. * * * If they did not know it was wrong when they paid these checks, then they are not guilty. If they did know it was wrong and the other facts are proven, as I think they are practically conceded, then they are guilty. * * * The main fact at least, is whether or not they paid out this money knowing that they had no right to do it, and it was wrong. If they did, they are guilty, if they did not, they are not guilty."

I think the appellants' contention should be upheld. Even though it were to be found by the jury that there was an actual sale to Dollard & Rosoff to which they could be held in a civil action by the city, coupled with a further finding that the payments were illegally made, no crime was committed if the defendants made the payments for the purpose of maintaining the credit of the city and as a mere exchange of checks and in recognition of a moral obligation on the part of the city to reimburse Dollard & Rosoff, so long as there was no criminal intention on the part of the defendants to deprive the city of any of its property. Section 253 of the Charter of the City of Long Beach, which was read into the record by the prosecution, provides, in substance, that no bill or account against the city shall be audited or paid unless the steps therein provided for, namely, the presentation of a sworn itemized bill, are complied with. The prosecution proved that no such claim had been presented in connection with the exchange checks. From this the inference was permissible that the defendants had no *right* to make the alleged payment because the formalities required by the charter had not been observed, again assuming that the jury might find that there had been an actual sale to Dollard & Rosoff. Having no *right* to make the payment, what the jury were, in effect, told here was that the defendants were aware that they were paying out moneys *wrongfully* because the charter provisions were ignored and, hence, were guilty of the crime charged against them. The jury were practically told that the defendants could be convicted of larceny independent of any theft simply because of a failure to comply with the charter provision. Again, the nature of the transaction which the defendants claim was wholly intended to protect the city's credit was carried out in such a manner as to effectuate a deception upon the public as to the real price obtained for the bonds. The jury may readily have concluded that what the defendants did was wrong. Such a finding required the further finding of guilt of the crime of larceny although the wrong claimed to have been done was quite consistent with the inference that the defendants had no felonious design. The conviction may properly be found by us to rest upon a finding by the jury that the defendants did an improper act to create the

false appearance that the city received par for the bonds and thereby misled the investing public. But this, again, under the charge, permitted a finding of guilt wholly without reference to whether or not the defendants stole money or whether or not they were moved by a felonious design to deprive the city of its funds.

But it is said that the court left the question of felonious intent to the jury in passing upon the defendants' request to charge. Granting this to be so in so far as concerned the necessity of finding a felonious intent, we still have the misleading charge unretracted that if the defendants knew that it was a *wrong* thing to do to exchange these checks with Dollard & Rosoff, they were guilty of the crime of grand larceny in the first degree.

The issue here was not alone whether there had been a valid and binding sale of the bonds to Dollard & Rosoff, but further, and of equal if not greater importance, whether in the minds of the parties they understood and believed that the city's bonds had actually been sold to Dollard & Rosoff. The case rests not upon a material dispute in the testimony but rather upon inferences from which the jury would be satisfied beyond a reasonable doubt that these appellants stole the city's money. In a case dependent so largely upon inferences from facts and which it seems to me, at best, was an exceedingly close if not doubtful case, the importance of a correct submission to the jury of the issues is obvious and this in my opinion the charge failed to do. It is again to be observed that these defendants did not appropriate to their own use a single dollar of the city's money and that if they are to be convicted of grand larceny it is because they aided and abetted Dollard & Rosoff wrongfully and feloniously to obtain the money of the city despite the oral undisputed testimony that neither Reynolds nor Gracy retained or possessed any part of it, or that Dollard & Rosoff obtained anything save the exchange of checks.

For the reasons given, the judgment of conviction should be reversed and a new trial granted.

JAYCOX and YOUNG, JJ., concur; MANNING, J., concurs for reversal, and votes to dismiss the indictment, on the ground that the evidence did not establish that the crime of larceny had been committed; and upon the further ground that no legal contract was ever entered into between the city of Long Beach and Dollard & Rosoff; KELLY, P. J., dissents, and reads for affirmance.

KELLY, P. J. (dissenting):

I am unable to agree with my associates in reversing the judgment in this case. I think the charge of the trial justice that the payment of the $2,440 by defendants to Dollard & Rosoff men-

tioned in the indictment (part of an aggregate of $19,360 taken from the city treasury and paid to the same people) was improper and unlawful; that the defendants had no right to make the payment; that it was money belonging to the city and that it was not paid out according to any lawful means or for any lawful purpose, was entirely correct and based upon the testimony of the defendants who took the witness stand in their own defense. Aside from the fact that the charge to the jury in this particular was not excepted to by the learned and experienced counsel for the defendants, I do not see how there can be any question as to the propriety of the instruction on the evidence. The money was in the city treasury; it was part of the proceeds of a public sale of bonds by the city conducted pursuant to law. Dollard & Rosoff, in writing, bid par for $484,000 of the bonds offered. There were other bidders. The bonds were awarded to Dollard & Rosoff by resolution entered on the minutes of the city council. I understand that a majority of my associates are of opinion that whether the transaction between the city and Dollard & Rosoff was a sale of the bonds to them at par for which they owed the city $484,000, should have been submitted to the jury. Again no exception was taken to the charge in this particular, nor can I find in the record anything to indicate that the defendants or their counsel questioned the fact. Indeed as I read the very careful and eloquent closing address of defendants' counsel to the jury, the validity of the sale was conceded, that the written bid duly accepted by the city council on its minutes constituted a valid, enforcible contract between the city and the bidders. I think there can be no dispute about it on the evidence. As matter of fact, Dollard & Rosoff paid into the city treasury the sum of $484,000 for these bonds. The city received the money — it was in the cash drawer. The defendants conceded it because they say that they made a private agreement with Dollard & Rosoff that they would protect them against any loss which the purchasers might sustain in disposing of the bonds so purchased by them. All this is proven out of the mouths of the defendants. The defendants took out of the cash drawer of the city $19,360, of which the sum of $2,440 mentioned in the indictment was part, and paid this money to Dollard & Rosoff. This was not done by any direction of the council; there was no entry of the alleged private agreement or of the payments made upon the minutes; it was in violation of the express provisions of the city charter and of the ordinances of the city, providing that none of the city's money should be paid out without proper voucher and entry made upon the city's books. It was not entered on the city's books. As the learned justice properly charged the jury without exception

or request to charge to the contrary, it was a payment of the money belonging to the city of Long Beach to Dollard & Rosoff, to whom it did not belong. It was not necessary that defendants should put the money in their own pocket or that they should derive personal benefit from the transaction. Taking the money of the city, the true owner, and paying it or appropriating it to the use of any person other than the true owner constituted the crime of larceny. (Penal Law, § 1290.) This is so in the case of any person wrongfully appropriating money which does not belong to him, and it is peculiarly applicable in the case of money belonging to municipal corporations. Where a public officer appropriates money of a city to his own use or to the use of any person not entitled thereto, without authority of law, or where such officer willfully audits or pays a false claim or demand or by any other means wrongfully pays out money in the possession of the city, the law declares that he is guilty of a felony. (Penal Law, §§ 1864, 1865.) Can there be any question on the defendants' own evidence that this money was taken by them out of the city treasury and paid to Dollard & Rosoff without warrant or authority of law and contrary to the provisions of the city charter? (See Charter of the City of Long Beach, § 253.) It seems to me to be idle to talk about the validity of the sale to Dollard & Rosoff. Certainly they did not question the validity of the sale — they paid for the bonds as they agreed to do. The defendants did not question the validity of the sale. The money was in the city treasury; it was the city's money; it was taken out of the city treasury by defendants on their own showing, secretly, unlawfully, without resolution or entry made on the books, and paid to the parties who had bid for the bonds and paid for them.

It is claimed that this was done because of some private arrangement made by the mayor of the city with the successful bidders for the bonds, by which he agreed that he or the city would make good any loss sustained by the bidders if they were unable to dispose of the bonds at the price they bid for them. Can it be claimed that any such arrangement, if made, was binding on the city or that it was legal or justified taking the city's money to carry out such a plan? If this sort of thing is to be countenanced it makes a farce of the statutory requirement that the bonds of the city must be sold " on sealed proposals or at public auction." (Village Law, § 129, as amd. by Laws of 1921, chap. 456,* made applicable to the city of Long Beach by Charter of the City of Long Beach,

---

* Since amd. by Laws of 1923, chap. 561; Laws of 1924, chap. 181, and Laws of 1925, chap. 300.— [REP.

§ 254.) Are we to say that municipal officers are justified in making secret arrangements of this kind with prospective bidders, or that they may offer such alleged secret arrangements as justification for subsequently taking the money of the taxpayers to make good these private arrangements? I think not. Such transactions are of serious importance not only to the city of Long Beach but to all the municipal corporations in the State, whether counties, cities, towns or villages.

It seems to me that the charge of the learned trial justice that defendants had no right to take the money out of the treasury to pay it to Dollard & Rosoff and that the payment was unlawful, was right and proper. The trial justice carefully instructed the jury that they were the sole judges of the facts, and that if his references to the evidence did not accord with their recollection they were to disregard his statements. The Court of Appeals has not decided in *People* v. *Walker* (198 N. Y. 329) or in any other case brought to my attention, that where a defendant in a criminal action voluntarily takes the witness stand and admits that he did or omitted to do the things charged against him he may assert that there still remains an issue of fact as to the precise thing admitted by him. A similar instruction was sustained by the Court of Appeals in *People* v. *Neff* (191 N. Y. 210).

Notwithstanding the instruction that the taking of this money by defendants out of the treasury and the payment thereof to Dollard & Rosoff was unlawful, the learned trial justice left the question of defendants' intent in making the payment to the jury. This was really the only issue in the case. If they knew it was unlawful, they were guilty of crime in making the payments. If there was any reasonable doubt about it, they were entitled to acquittal. He told them that if the payment was made openly and avowedly and in good faith, they could not be convicted even though their claim was untenable; that even though they might have been mistaken as to the law they were not to be convicted because they made a mistake as to the law. He told the jury that there must have been a felonious intent on the part of the defendants and that if the jury could reconcile the evidence before them with any reasonable hypothesis consistent with the innocence of the defendants it was their duty so to do and to find the defendants not guilty; that if the conduct of the defendants was equally susceptible of two opposite explanations, the jury was bound to assume that it was moral rather than immoral; that before the jury could convict the defendants they must find that the facts clearly and unequivocally proved the guilt of the defendants and that they could not be reasonably reconciled with any other conclusion.

These were the last words from the trial justice to the jury in this case. The jury found them guilty.

I will not detail here the additional evidence in the record which seems to justify the verdict. Again there was no dispute about the facts. They were proven out of the mouths of the defendants themselves. When subsequently this particular transaction became the subject of investigation by the State Comptroller and the grand jury of the county, there is evidence that the defendants sought to cover it up and conceal the true facts by three separate and distinct schemes, each of them false. At first it was sought to make it appear that the money was paid to Dollard & Rosoff, not as a loss on the sale of the bonds, but in alleged settlement of a claim for extra work on their contract for grading and paving streets in the city. The contractors claimed that their bid for the work was too low. The ·defendant mayor had denounced their claim as " absurd on its face " and stated " there is no claim of any kind that we can recognize." He reported to the council on February 6, 1923, that the claim was withdrawn. Nevertheless he testified on the trial: " I made a settlement with Mr. Rosoff both on the bond transaction and on the extra that he claimed of twenty-one or twenty-two thousand dollars for this $19,360 and that is why this resolution was put through. It was to settle all our differences." But the so-called " settlement " was made eleven or twelve months after the money had already been taken from the treasury without warrant or voucher and paid to Dollard & Rosoff and before they had made any claim for extra work. As a second effort to conceal the true purpose of the payments it was proven that the mayor had instructed the city engineer to prepare a certificate for work done by Dollard & Rosoff consisting of three items: (1) For extra work on their contract, $13,440; (2) grading on Broadway, $3,200; (3) grading on sewers, $2,720, the three items aggregating the exact amount taken from the city treasury, viz., $19,360, although defendant Reynolds admitted on the witness stand that Dollard & Rosoff did not do the work on Broadway or the sewer work. A third effort to conceal the unlawful payment is found in the record of a meeting of the city council on September 4, 1923, when the defendant Reynolds voted for a resolution reciting that Dollard & Rosoff had presented a claim based on increased cost of labor and materials and had given notice that they would not proceed with the work unless they were paid additional money; that careful investigation had been made by the council; that no other contractors could be procured to do the work; that the claim was presented in good faith; and that " your Committee " agreed to pay them $19,360 in addition to the amount specified in their contract,

**40**   Matter of District No. 2, Town of Brookhaven.

Third Department, May, 1925.   [Vol. 214

and " gave directions to the Treasurer to make such additional payments to Dollard & Rosoff accordingly, said additional sum to be paid proportionately in installments as and when said assessment bonds were taken up and paid for by Dollard & Rosoff in accordance with their bid," and the resolution proceeded to ratify the action of the " Committee " and the action by the city treasurer in " making payments in accordance with the above." This resolution contains a reference to the award of the bonds to Dollard & Rosoff and recites that their bid was " the highest and only legal bid therefor."

The defendant Reynolds testified that he was responsible for the resolution. He said: " I take all the responsibility."

There is no dispute on the evidence as to the real purpose of the taking of the $19,360 from the treasury and the payment to Dollard & Rosoff. The transactions recited in the resolution were fictitious. I think the jury was justified in finding that these efforts on the part of the defendants to cover up the facts were evidence of intentional wrongdoing.

For these reasons I think the judgment should be affirmed.

Judgment of conviction reversed on the law and the facts, and a new trial granted.